

**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

**ENTERED
03/21/2014**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Charles Philip Cowin,** | § | **Case No: 13-30984** |
| | § | |
| Debtor. | § | **Chapter 7** |

**MEMORANDUM OPINION REGARDING TRUSTEE'S OBJECTION TO
HOMESTEAD EXEMPTION UNDER 11 U.S.C. § 522(o) & (p)[1] AND REQUEST FOR
PROTECTION OF THE ESTATE'S INTEREST IN PROPERTY**
**[Doc. No. 83]**

### I.  INTRODUCTION

The Court writes this opinion for several reasons.  First, the dispute at bar involves 11

U.S.C. § 522(o)[2], a provision enacted by BAPCPA[3] about which there is a paucity of case law,

particularly as to the form of relief that should be awarded if all elements are satisfied.  Second,

the debtor in this case has raised three defenses as to why he did not disclose certain transactions

in his Schedules, Statement of Financial Affairs (SOFA), and Monthly Operating Report (MOR):

(1) he relied on his former attorneys;  (2) the transactions were in the ordinary course of his

business and therefore did not need to be disclosed; and (3) even if  he did not make complete

disclosure, he made sufficient disclosure to put his creditors on "inquiry notice" such that he

cannot now be found to have intended to defraud them.  These defenses are easier to plead than

---

[1] The Trustee has withdrawn the Objection lodged under 11 U.S.C. § 522(p).  The Objection is now based solely on
11 U.S.C. §522(o).

[2]  Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §)
refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted.  Further, any
reference to "the Bankruptcy Rules" refers to the Federal Rules of Bankruptcy Procedure.

[3] In 2005, Congress amended the Bankruptcy Code.  The changes in the Bankruptcy Code are commonly referred to
as the BAPCPA amendments because the law is entitled the "Bankruptcy Abuse Prevention and Consumer
Protection Act" (BAPCPA).

to prove, and the debtors' bar needs to be aware of the hurdles their clients must overcome to prevail on these defenses.

The dispute at bar is between Ronald J. Sommers, the Chapter 7 trustee in this case (the Trustee), and Charles Philip Cowin, the debtor (the Debtor).  On July 12, 2013, the Trustee filed an objection to the Debtor's homestead exemption (the Objection) [Doc. No. 83]; and on August 2, 2013, the Debtor filed a response opposing the Objection [Doc. No. 86].  This Court held a hearing on the Objection on September 4, 2013, September 11, 2013, October 1, 2013, October 18, 2013, November 20, 2013, and December 3, 2013.  At the close of the hearing, the Court took the matter under advisement.  On December 9, 2013, the Debtor filed a Trial Memorandum Regarding the Objection [Doc. No. 152], and on December 13, 2013, the Trustee filed his Trial Brief [Doc. No. 154].

This Court now makes the following Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52, as incorporated into Bankruptcy Rules 7052 and 9014.  To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such.  The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.  For the reasons set forth herein, this Court sustains the Objection.

## II.  FINDINGS OF FACT

The relevant facts—as established by the pleadings, the admitted exhibits, the testimony of the witnesses, and the stipulations and admissions of the parties—are as follows:

### A.   Background of the Debtor

1. The Debtor received his undergraduate degree from Denison University and received an MBA degree from the University of Chicago.  [Oct. 1, 2013 Tr. 39:12–13 & 40:5–6].

2. The Debtor was employed at Exxon for 29 years. [Dec. 3, 2013 Tr. 19:7–9]. He retired several years ago, and his Schedule I in this case lists his occupation as "Developer/realtor." [Sept. 11, 2013 Tr. 34:10–20].

3. The Debtor is a licensed real estate broker.  [Oct. 1, 2013 Tr. 40:9].  To acquire his license, the Debtor completed the required six courses and passed the required examination.  [Oct. 18, 2013 Tr. 13:9–18].  This training exposed the Debtor to the forms of contracts generally known as real estate purchase and sales agreements, and contracts for deed.  [*Id.* at 13:19 – 14:1].

4. Prior to filing this pending Chapter 7 case, during his career as a real estate broker, the Debtor handled real estate closings. [Oct. 18, 2013 Tr. 14:11–13 & 16:2–4]. Indeed, the Debtor testified that he has "been involved in many, many real estate transactions over the years . . . . we're talking about many, many years of real estate transactions." [Dec. 3, 2013 Tr. 56:14–16 & 57:16–17].  The Debtor also understands the steps that are necessary to consummate a purchase and sale agreement for real estate.  [Oct. 18, 2013 Tr. 15:12–25].

5.  During the five years prior to filing this Chapter 7 case, in addition to buying and selling real estate, the Debtor developed real estate in New Mexico.  [Oct. 1, 2013 Tr. 42:13–20 & 43:3–6].   The Debtor's attorney described the Debtor's business as follows: "he had a real estate kingdom, that he had a fortune in developable property in New Mexico, and interests here in Texas that if he could just get the time to ride out the economy that everything would be well." [Oct. 18, 2013 Tr. 39:24–40:3].

6.  The Debtor formed numerous business entities for the specific purpose of conducting his real estate business.  [Oct. 1, 2013 Tr. 48:11–18].  The names of these entities were as follows:

    1.  Houston Property Data Services;

    2.  Woodway Campton GP, Inc.;

    3.  Woodway Campton, Ltd.;

    4.  Compton Equity Partners, LP;

    5.  Flintshire, LLC;

    6.  Ute Meadows, LLC;

    7.  Angel Fire Land Holdings, LLC;

    8.  Village South Development, LLC;

    9.  Chartana Four, LLC; and

    10. Stanwich, LLC;

[Case No. 10-34132, Doc. No. 1, pp. 61–62].

7.  By May 19, 2010, the Debtor had acquired twelve real properties in order to develop them in the course of his real estate business. [Case No. 10-34132, Doc. No. 1, p. 6; Trustee's Ex. 7, p. 6; *see also* Oct. 1, 2013 Tr. 43:20–45:12].

**B.**     **Background of the Debtor's Relationship With Midtown Edge, L.P.**

8.   Midtown Edge, L.P. (MELP) was the developer of a condominium complex located at 300 St. Joseph Parkway, Houston, Texas. [Doc. No. 83, p. 4, ¶ 15; *see also* Doc. No. 86, p. 2, ¶ 15].

9.   Prior to March 28, 2008, the Debtor held the contractual right to purchase approximately twenty-two of the condominium units at 300 St. Joseph Parkway, Houston, Texas. [Doc. No. 83, p. 4, ¶ 15; *see also* Doc. No. 86, p. 2, ¶ 1; Dec. 3, 2013 Tr. 13:18–25].

10.  The Debtor decided to extinguish his contractual right to purchase all but six of the condominium units in exchange for MELP giving him a promissory note for $230,000.00. [Oct. 1, 2013 Tr. 69: 3–7]. On March 28, 2008, MELP executed and delivered to the Debtor that one certain promissory note in the original principal amount of $230,000.00 (the 2008 Note). [Trustee's Ex. No. 1].  Under the terms of the 2008 Note, MELP was required to pay the balance by no later than December 31, 2008.  [*Id.*].

11.  MELP defaulted under the 2008 Note by failing to pay the balance by December 31, 2008. [Oct. 1, 2013 Tr. 69:8–15].

12.  Under the terms of the 2008 Note, if MELP failed to pay the principal balance by December 31, 2008, then interest would accumulate at the per annum rate of 15%. [Trustee's Ex. No. 1, p. 1, ¶¶ 1–2].  Thus, as of January 1, 2009, interest began accruing on the 2008 Note.

13.  Because MELP failed and refused, and continued to fail and refuse, to make payment under the 2008 Note, the Debtor, in August of 2009, filed suit against MELP in the

5

District Court of Harris County, Texas, 113th Judicial District (the State Court Lawsuit). [Dec. 3, 2013 Tr. 15: 13–16:1; *see also* Trustee's Ex. No. 2].

14. The State Court Lawsuit remained pending on the docket of the Harris County District Court for the rest of 2009 and carried over into 2010. [Dec. 3, 2013 Tr. 15: 13–16:19].

**C.    Background of the Debtor's First Chapter 11 Case**

15. On February 24, 2010, the Debtor filed his first Chapter 11 petition, which was assigned Case No. 10-31478 (the First Chapter 11 Case). [Doc. No. 83, p. 2, ¶ 5; Doc. No. 86, p. 2, ¶ 5; Case No. 10-31478, Doc. No. 1, pp. 1–3; Trustee's Ex. No. 5, pp. 1–3].

16. On the same day that the Debtor initiated the First Chapter 11 Case, the Debtor, through his attorney, filed an incomplete set of Schedules. Specifically, the Debtor filed only Schedules A, B, D, E, and F; the Debtor did not file Schedules C, E, G, H, I, or J; nor did the Debtor file his SOFA. [Case No. 10-31478, Doc. No. 1, pp. 4–34; Doc. No. 83, pp. 2–3, ¶ 6; *see also* Doc. No. 86, p. 2, ¶ 6; Trustee's Ex. No. 5, pp. 4–34]. The five Schedules that were filed were not signed by the Debtor, but only by his attorney.[4] The Debtor did, however, provide his attorney with the information contained in these Schedules, and the Debtor reviewed and approved of these Schedules prior to his attorney filing them. [Dec. 3, 2013 Tr. 9:21–10:11].

17. Schedule A represented that the Debtor had a "Fee Simple" interest in a particular condominium unit at the MELP condo complex, specifically 300 S. Joseph Pky.,

---

[4] The Court notes that at the hearing on the Objection, the Debtor testified that both he **and** his former bankruptcy attorney (Richard Fuqua) signed the Schedules. [Dec. 3, 2013 Tr. 9:19–20]. A review of the Schedules, however, reflects that only the attorney signed. [*See* Case No. 10-31478, Doc. No. 1; Doc. No. 83, pp. 2–3, ¶ 6; Doc. No. 86, p. 2, ¶ 6].

#320, Houston, TX 77002 (Unit 320); that the current value of the Debtor's interest in Unit 320, without deducting any secured claim or exemption, was $240,000.00; and that the amount of the secured claim associated with Unit 320 was $0.00. [Case No. 10-31478, Doc. No. 1, p. 5; Trustee's Ex. No. 5, p. 5; Doc. No. 83, p. 3 ¶ 6; *see also* Doc. No. 86, p. 2, ¶ 6]. Schedule A also represented the following: "Unit 320, Contract for Deed, 300 S. Joseph Pky., #320, Houston, TX 77002." [Case No. 10-31478, Doc. No. 1, p. 5; Trustee's Ex. No. 5, p. 5; Doc. No. 83, p. 3 ¶ 6; *see also* Doc. No. 86, p. 2, ¶ 6]. Thus, the Debtor was representing to this Court and to his creditors that he owned Unit 320 and that he had entered into a contract for deed to sell Unit 320 to some third party. [*See* Oct. 1, 2013 Tr. 8:2–7, 9:9–10].[5]

18. Schedule B represented that MELP owed the Debtor the amount of $286,847.92. [Case No. 10-31478, Doc. No. 1, p. 10; Trustee's Ex. No. 5, p. 10; Doc. No. 83, p. 3, ¶ 6; *see also* Doc. No. 86, p. 2, ¶ 6]. The Debtor did **not** disclose that the 2008 Note evidenced this debt. [*See* Case No. 10-31478, Doc. No. 1, p. 10; Trustee's Ex. No. 5, p. 10]; rather, he described this obligation only as "Midtown Edge, LP, 4544 Post Oak Place, Suite 392, Houston, TX 77027". In addition to scheduling the debt owed by MELP, the Debtor also scheduled several other debts that were owed to him. [*See* Case No. 10-31478, Doc. No. 1, p. 10]. The Debtor described three of these debts as: "(Promissory Note) doubtful collection," and one of these debts as follows: "(Loan) doubtful collection." [*Id.*]. The Debtor did **not** make any of these representations

---

[5] At the hearing on the Objection, the Trustee testified that his review of the Debtor's Schedule A, and the description of the Debtor's interest in Unit 320, indicated that the Debtor had a fee simple interest in Unit 320 and that he had entered into a contract for deed to sell Unit 320 to some third party. [Sept. 4, 2013 Tr. 37:14–38:14]. The Court agrees with the Trustee's interpretation. The Debtor, however, contends that Schedule A reflects not that he owned Unit 320 and was selling it to a third party, but rather that he had an oral agreement that was going to be reduced to a written contract for deed giving him the right to purchase a fee simple interest in Unit 320 in the future. The Court finds this position to be untenable, as subsequently discussed herein.

with respect to the debt of $268,847.92 owed to him by MELP.  [*Id.*].  Nor did the Debtor make this "doubtful collection" representation with respect to the five promissory notes totaling $17,992.65 owed to him by a Ms. Nancy Graves.  [*Id.*]. Thus, the Debtor represented to this Court and his creditors that the debt owed by MELP was a **collectible** debt in the amount of $286,847.92 **not** evidenced by a promissory note.

19. The deadline for the Debtor to file his remaining Schedules and his SOFA was March 10, 2010.  FED. R. BANKR. P. 1007(c).  The Debtor failed to meet this deadline; this Court waited more than two weeks to see if the Debtor would file these documents; but, he did not do so.  [*See* Case No. 10-31478, Docket sheet].  Accordingly, twenty-one days after this deadline passed—i.e., on March 31, 2010—this Court dismissed the First Chapter 11 Case due to the Debtor's failure to timely file all of his Schedules and his SOFA. [Case No. 10-31478, Doc. No. 26; *see also* Doc. No. 83, p. 3, ¶ 8; Doc. No. 86, p. 2, ¶ 8; Trustee's Ex. No. 6].

D.   **The Debtor's Confidential Settlement Agreement With MELP**

20. On the evening of May 18, 2010—i.e., one day before the Debtor filed his second Chapter 11 petition—the Debtor entered into a Confidential Settlement Agreement (the CSA) with MELP in order to settle the State Court Lawsuit.  [Doc. No. 83, p. 5, ¶ 16; *see also* Doc. No. 86, p. 3, ¶ 16; Trustee's Ex. No. 2; Oct. 1, 2013 Tr. 57:17–58:3, 70:17–24, 120:25–121:7, 122:4–9 & 122:24–123:3].  The CSA provided for an exchange of the 2008 Note—which at the time bore an outstanding balance of $276,500.48[6]—for a replacement note in the same amount to be paid over several

---

[6] The original principal amount of the 2008 Note was $230,000.00. [Finding of Fact No. 10].  However, MELP defaulted under the 2008 Note [Finding of Fact No. 11]; therefore, under the terms of the 2008 Note, interest began

months.  [Doc. No. 83, p. 5, ¶ 16; *see also* Doc. No. 86, p. 3, ¶ 16; Trustee's Ex. No. 2, pp. 1–2; Oct. 1, 2013 Tr. 71:25–72:3].  Further, the CSA provided that MELP would execute a contract for deed giving the Debtor a contractual right to purchase Unit 320 for the amount of $289,000.00.  [Doc. No. 83, p. 5, ¶ 16; *see also* Doc. No. 86, p. 3, ¶ 16; Trustee's Ex. No. 2, pp. 3–4, ¶ 5; Oct. 1, 2013 Tr. 72:4–13].

21. Immediately after the Debtor and MELP executed the CSA, the following actions were taken in accordance with the CSA:

> (a) The Debtor surrendered the 2008 Note to MELP with the Debtor's handwritten notation on the first page that this note was "Cancelled" [Oct. 1, 2013 Tr. 103:8–21]

> (b) MELP executed and delivered to the Debtor a promissory note payable to the Debtor in the principal amount of $276,500.48 (the 2010 Note) [Trustee's Ex. No. 3; Doc. No. 83, p. 5, ¶ 17; *see* Doc. No. 86, p. 3, ¶ 17; *see also* Oct. 1, 2013 Tr. 99:5–9]; and

> (c) MELP and the Debtor executed a contract for deed granting the Debtor the contractual right to purchase Unit 320 for $289,000.00 (the Contract for Deed) [Trustee's Ex. No. 4; Doc. No. 83, p. 5, ¶ 18; *see* Doc. No. 86, p. 3, ¶ 18].

In granting the Debtor the right to purchase Unit 320 for the sum of $289,000.00, the Contract for Deed set forth that this amount could be paid as follows: (a) the Debtor could credit the outstanding balance due under the 2010 Note against the price of $289,000.00 [Trustee's Ex. No. 4, p. 3; Doc. No. 83, pp. 5–6, ¶ 18]; and then (b) the

---

to accrue at the per annum rate of 15% as of January 1, 2009 [Finding of Fact No. 12].  Thus, by May 18, 2010, the balance owed under the Note was $276,500.48.

Debtor could execute a promissory note payable to MELP for the remainder of the purchase price, with this note to be secured by a deed of trust on Unit 320 [Trustee's Ex. No. 4, pp. 4–5, Doc. No. 88, p. 6, ¶ 18].

22. The Contract for Deed also provided that the Debtor's purchase of Unit 320 for the price of $289,000.00 would occur on the earlier of: (a) the date MELP delivered a general warranty deed conveying Unit 320 to the Debtor; (b) such other date as the Debtor designated in writing in the event MELP defaulted under the Contract for Deed or the CSA, failed to deliver the warranty deed and title policy to the Debtor, or filed for bankruptcy; or (c) October 1, 2011. [Trustee's Ex. No. 4, p. 3; Doc. No. 83, p. 6, ¶ 18]. Thus, the Contract for Deed expressly provided that MELP's sale of Unit 320 to the Debtor for the purchase price of $289,000.00 would occur sometime in the future, and not contemporaneously upon the execution of the Contract for Deed on May 18, 2010 by MELP and the Debtor. [Doc. No. 83, p. 6, ¶ 18].

23. On the morning of May 19, 2010, just prior to the Debtor's filing of his second Chapter 11 petition (which occurred at 11:20 a.m.[7]), the Debtor signed both the Contract for Deed and the CSA once again—this time in the presence of a notary public. [Oct. 1, 2013 Tr. 70:17–24, 73:8–25 & 122:24–123:10].[8]

_____

[7] The docket sheet reflects that the Debtor filed his second Chapter 11 petition at 11:20 a.m. on May 19, 2010. [*See* Case No. 10-34132, Docket sheet].

[8] The Court finds that the Debtor signed the Contract for Deed before a notary just prior to filing his second Chapter 11 petition because the Debtor, at his 2004 examination, testified as follows: Q: "And, again, the contract for deed was signed on the same day you filed these [bankruptcy] schedules; correct?" A: "Yes. I believe before I filed the schedules." (emphasis added). [Trustee's Exhibit No. 24, p. 6].

With respect to the CSA, the Court finds that the Debtor and MELP's representative once again executed this document on the morning of May 19, 2010, **prior to** the Debtor's filing of his Chapter 11 petition at 11:20 a.m., for the following reason. During the hearing on the Objection, the Debtor answered "Yes" to the following question posed by his counsel: "Now, sir, **between** signing the Settlement Agreement and the closing [of March 11, 2011], you had filed a second Chapter 11 proceeding; is that correct?" [Dec. 3, 2013 Tr. 33:8–11 (emphasis added)]. The word "between" indicates that the Debtor and MELP first signed the CSA; the Debtor then filed his Chapter 11

E.    **Background of the Debtor's Second Chapter 11 Case**

24. On May 19, 2010, at 11:20 a.m., the Debtor filed his second Chapter 11 petition, which was assigned Case No. 10-34132 (the Second Chapter 11 Case). [Case No. 10-34132, Doc. No. 1, pp. 1–3; Trustee's Ex. No. 7, pp. 1–3; *see also* Doc. No. 83, p. 3, ¶ 9; Doc. No. 86, p. 2, ¶ 9].

25. On the same day, the Debtor filed a complete set of Schedules [Case No. 10-34132, Doc. No. 1, pp. 6–52; Trustee's Ex. No. 7, pp. 6–52; *see also* Doc. No. 83, p. 3, ¶ 10; Doc. No. 86, p. 2, ¶ 10]. The Debtor signed these Schedules under penalty of perjury, declaring that the information set forth therein was true and correct. [Case No. 10-34132, Doc. No. 1, p. 53; Trustee's Ex. No. 7, p. 53]. On this same day, the Debtor also filed his SOFA, which he signed under penalty of perjury that the information contained therein was true and correct. [Case No. 10-34132, Doc. No. 1, pp. 54–64; Trustee's Ex. No. 7, pp. 54–64]. The Debtor provided his attorney with the information set forth in these Schedules and SOFA; the Debtor reviewed these Schedules and SOFA with his attorney; and after do so, the Debtor authorized his attorney to file these documents. [Dec. 3, 2013 Tr. 11:1–19].

26. Similar to Schedule A in the First Chapter 11 Case, Schedule A in the Second Chapter 11 Case represented that the Debtor had a "Fee Simple" interest in Unit 320. [*See* Case No. 10-34132, Doc. No. 1, p. 6; Trustee's Ex. No. 7, p. 6; *see also* Doc. No. 83, p. 3, ¶ 11; Doc. No. 86, p. 2, ¶ 11]. However, this time, Schedule A represented that the current value of the Debtor's interest in Unit 320, without deducting any secured claims or exemption, was $289,000.00; that the amount of the

---

petition; and the closing (discussed subsequently herein) occurred thereafter. *See* Section II(F), for a discussion about the closing, which took place on March 11, 2011.

secured claim associated with Unit 320 was $49,000.00; and included the following language: "Subject to setoff pursuant to settlement agreement."  [Case No. 10-34132, Doc. No. 1, p. 6; *see also* Doc. No. 83, pp. 3–4, ¶ 11; Doc. No. 86, p. 2, ¶ 11]. According to the Debtor, MELP was the secured creditor, which held the $49,000.00 lien. [Oct. 1, 2013 Tr. 95:3–5].  The Debtor, however, did not list MELP's secured claim on his Schedule D.[9]  [*See* Case No. 10-34132, Doc. No. 1, pp. 18–25].

27. Schedule B did **not** disclose that the Debtor was the owner and holder of the 2010 Note bearing the balance of $276,500.48.  Rather, Schedule B represented that MELP owed the Debtor the amount of $37,543.56 and set forth the following: "$277,543.56 settlement with $240,000 applied to Unit #320 purchase pursuant to settlement agreement."  [Case No. 10-341332, Doc. No. 1, pp. 11–12; Trustee's Ex. No. 7, p. 11–12; *see also* Doc. No. 83, p. 4, ¶ 12; Doc. No. 86, p. 2, ¶ 12].  In addition to scheduling what the Debtor represented was a $37,543.56 debt owed by MELP, the Debtor also scheduled six other debts owed to him.  [*See* Case No. 10-341332, Doc. No. 1, pp. 11–12; Trustee's Ex. No. 7, p. 11–12].  Just as in Schedule B in the First Chapter 11 Case, the Debtor described three of these debts as "(Promissory Note) doubtful collection," and one of these debts as "(Loan) doubtful collection."  [*See* Case No. 10-341332, Doc. No. 1, p. 12].  With respect to one of these debts, the Debtor expressly set forth the following: "Lease on land (terminated) Doubtful collection." [*Id.*].  The Debtor did **not** make any of these representations with respect to the debt of $37,543.56 owed to him by MELP. [*Id.*; Dec. 3, 2013 Tr. 67:5–8].  That is, he did not schedule the $37,543.56 debt owed by MELP as either a "Promissory

---

[9] Schedule D, which is entitled "Creditors Holding Secured Claims," requires a debtor to disclose, among other information, the name, address, and amount of debt of each creditor who has a lien on any asset in which the debtor has an interest on the date of the filing of the debtor's bankruptcy petition.

Note" or as one of "doubtful collection."  Thus, the Debtor was representing to this Court and his creditors that the debt owed by MELP was a **collectible** debt of $37,543.56 that was **not** evidenced by a promissory note.

28. On his Schedule C, the Debtor claimed Unit 320 as his exempt homestead pursuant to Article 16, §§ 50 and 51 of the Texas Constitution and §§ 41.001 and 41.002 of the Texas Property Code. [Case No. 10-34132, p. 15; Trustee's Ex. No. 7, p. 15; *see also* Doc. No. 83, p. 4, ¶ 13; Doc. No. 86, p. 2, ¶ 13].

29. On his Schedule G, which requires disclosure of all executory contracts and unexpired leases, the Debtor did **not** list the Contract for Deed.  [Case No. 10-34132, Doc. No. 1, pp. 45–46; Trustee's Ex. No. 7, pp. 45–46; Oct. 1, 2013 Tr. 95:20–22]. The Debtor did, however, list leasehold agreements that he had with tenants who were leasing other units of the condominium complex at St. Joseph Parkway, as well as units at other locations. [Case No. 10-34132, Doc. No. 1, pp. 45–46; Trustee's Ex. No. 7, pp. 45–46].

30. On his SOFA, in answer to question number 10,[10] the Debtor made no disclosure about his transfer (i.e., his surrender) of the 2008 Note to MELP, which was one of the actions taken by the Debtor pursuant to the CSA [Finding of Fact No. 21].[11] [Case No. 10-34132, Doc. No. 1, p. 58; Trustee's Ex. No. 7, p. 58; Oct. 1, 2013 Tr. 104:2–21].

---

[10] Item number 10 of the SOFA is entitled "Other transfers" and requires the Debtor to "[l]ist all other property, other than property transferred in the ordinary course of the business or financial affairs of the [D]ebtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case."

[11] Because, pursuant to the CSA, the Debtor marked the 2008 Note as "Cancelled," and transferred the 2008 Note to MELP in exchange for the 2010 Note **just prior to** filing the Second Chapter 11 Case [*see* Findings of Fact Nos. 20 & 21], he should have disclosed this transfer in his answer to item number 10 on his SOFA.

31. On his SOFA, in answer to item number 4,[12] the Debtor disclosed the existence of fourteen pending lawsuits in which he was a party on the date of the filing of the Second Chapter 11 Case.  [*See* Case No. 10-34132, Doc. No. 1, pp. 55–56].  Of these fourteen suits, the Debtor disclosed that he was a defendant in eight of these suits. [*Id.*].

32. On August 11, 2010, the Debtor filed amended Schedules B, C, D and F.  [Case No. 10-34132, Doc. No. 50; Trustee's Ex. No. 8].  The Debtor provided his attorney with the information set forth in these amended Schedules, and the Debtor reviewed and approved these amended Schedules prior to his attorney filing them.  [Dec. 3, 2013 Tr. 12:3–13:8].    Additionally, the Debtor signed these amended Schedules under penalty of perjury, declaring that the information contained therein was true and correct.  [Case No. 10-34132, Doc. No. 50, p. 37; Trustee's Ex. No. 8, p. 37].  In these amended Schedules, the Debtor made some amendments, but he made no changes at all from his initial Schedules concerning Unit 320, the description of the debt owed to him by MELP, or the amount of the debt owed to him by MELP.  [Sept. 4, 2013 Tr. 44:21–46:11; *compare* Case No. 10-34132, Doc. No. 1, pp. 11–12, *with* Case No. 10-34132, Doc. No. 50, pp. 5–6].

**F.  Approximately Ten Months after the Debtor Initiated the Second Chapter 11 Case, He Acquired a Warranty Deed to Unit 320 by Surrendering the 2010 Note to MELP and Executing and Delivering to MELP a Promissory Note for $52,880.00 and a Deed of Trust Securing this $52,880.00 Note**

33. On March 11, 2011—while the Second Chapter 11 Case was still pending—the Debtor exercised his right under the Contract for Deed to purchase Unit 320.  Under

---

[12] Item number 4 of the SOFA is entitled "Suits and administrative proceedings, executions, garnishments and attachments" and requires the Debtor to "[l]ist all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case."

the Contract for Deed, the purchase price of Unit 320 was $289,000.00. [Oct. 1, 2013 Tr. 108:12–18]. To pay this amount, the Debtor, as allowed under the Contract for Deed, took the following actions:

(a) He surrendered the 2010 Note, which had a balance owed at that time of $236,120.00, by handwriting the phrase "Pd in full" on it and delivering it to MELP [*Id.* at 108:20–109:2; *see also* Trustee's Ex. No. 11, p. 1; Trustee's Ex. No. 3].

(b) He executed and delivered to MELP a promissory note payable to MELP for $52,880.00 (the $52,880 Note), representing the remaining amount of the purchase price[13][Trustee's Ex. No. 13; Oct. 1, 2013 Tr. 111:5–13]; and

(c) He executed and delivered to MELP a deed of trust securing the $52,880 Note (the Deed of Trust). [Trustee's Ex. No. 14; Oct. 1, 2013 Tr. 111:14–22].

In exchange for the Debtor's delivery to MELP of the 2010 Note marked "Pd in full," the $52,880 Note, and the Deed of Trust, MELP executed and delivered to the Debtor a warranty deed conveying Unit 320 to the Debtor. [Trustee's Ex. No. 12; Oct. 1, 2013 Tr. 109:12–110:12]. The transaction that the Debtor and MELP effectuated on March 11, 2011 (the March 11, 2011 Transaction) is documented in a 3-page Settlement Statement (the Settlement Statement) signed by the Debtor, a representative of MELP, and a settlement agent employed by the Star Tex Title Company, L.L.C. [Trustee's Ex. No. 11]. The Settlement Statement reflects that a

---

[13] On March 11, 2011, the balance owed by MELP under the 2010 Note was $236,120.00. [Oct. 1, 2013 Tr. 108:20–109:2]. By surrendering this Note to MELP marked "Pd in full," this amount was applied against the purchase price of $289,000.00. [*Id.* at 108:15–109:2]. Thus, the balance of the purchase price that the Debtor then had to pay to MELP was $52,880.00 (i.e., $289,000.00 - $236,120.00 = $52,880.00).

bona fide closing took place to effectuate the Debtor's acquisition of Unit 320 by a warranty deed. This document is a standard form typically used at any closing where real estate is being conveyed. Here, the Settlement Statement reflects that a settlement agent from StarTex Title Company, LLC conducted this closing on March 11, 2011. [*Id.* at p. 1]. The Settlement Statement is signed not only by this settlement agent, but also by the Debtor and an authorized representative of MELP (i.e., John S.M. Tuschman, who is identified on the Settlement Statement as a managing partner of MELP). [*Id.* at p. 3; Oct. 1, 2013 Tr. 122:4–13].

34. On March 11, 2011, when the Debtor took the actions described in Finding of Fact No. 33, he was the debtor-in-possession in the Second Chapter 11 Case. [*See* Oct. 1, 2013 Tr. 112:17–22]. He took these actions without notice to his creditors and without seeking permission from this Court. [Oct. 1, 2013 Tr. 112:23–113:7].

**G.     The Debtor's Monthly Operating Report (MOR) for March of 2011**

35. On May 26, 2011, in the Second Chapter 11 Case, the Debtor filed his MOR for the month of March, 2011.[14] [Case No. 10-34132, Doc. No. 155; Trustee's Ex. No. 15]. The Debtor signed this MOR under penalty of perjury, certifying that the information contained therein was true and correct. [Case No. 10-34132, Doc. No. 155, p. 1; Trustee's Ex. No. 15, p. 1]. On the first page of this MOR, in response to the question, "Were any assets disposed of outside the normal course of business?" the Debtor circled "No." [Case No. 10-34132, Doc. No. 155, p. 1; Trustee's Ex. No. 15, p. 1]. On the third page of this MOR, the Debtor, in his own handwriting, wrote the following:

---

[14] Monthly operating reports—known in bankruptcy parlance as MORs—are required to be filed by any person or business entity that is in a Chapter 11 case. The purpose of these reports is to provide creditors with up-to-date information about the debtor's financial condition.

16

| | |
|---|---|
| Closing Costs on Unit #320 | 2,387.60 |
| execution of contract for deed | |
| unit closed 3/11/11 | |

[Case No. 10-34132, Doc. No. 155, p. 3; Trustee's Ex. No. 15, p. 3]. This handwritten

note makes no reference as to whether the Debtor is buying or selling Unit 320. Nor does

this handwritten note make any reference to: (a) the Debtor's delivery of the 2010 Note to

MELP marked "Pd in full;" (b) the Debtor's delivery to MELP of the $52,880 Note and

Deed of Trust; or (c) MELP's delivery of the warranty deed to the Debtor conveying Unit

320 to him. Nor did the Debtor attach the Settlement Statement or the CSA to this MOR.

On the fourth page of this MOR, in the category entitled "Post-Petition Liabilities" under

MFR-3, in the sub-category entitled "Secured," the Debtor typed the following: "Note on

Unit 320 intended homestead*" [Case No. 10-34132, Doc. No. 155, p. 4]. The "*" refers

to a footnote that the Debtor added to the bottom of this page, which states: "Pre-petition

secured claim of $49,000 was listed under Schedule A – Real Property. This note of

$52,880 is that secured claim on unit 320 claimed under Schedule C – Exempt Property

intended homestead." [*Id.*].

**H.    The Dismissal of the Debtor's Second Chapter 11 Case**

36. On January 6, 2012, this Court dismissed the Second Chapter 11 Case with prejudice

to refiling for 180 days due to the fact that the Debtor had abused the bankruptcy

process by filing two Chapter 11 petitions within the prior two years without ever

filing a plan and disclosure statement. [Case No. 10-34132, Doc. No. 227].

**I.    Background of the Debtor's Pending Chapter 7 Case**

37. On February 21, 2013, approximately 13 months after the dismissal of the Second

Chapter 11 Case, the Debtor filed a Chapter 7 petition, initiating the pending Chapter

17

7 case (the Pending Chapter 7 Case).  [Case No. 13-30984, Doc. No. 1; Trustee's Ex. No. 17].

38. On March 1, 2013, the Debtor filed his original Schedules and original SOFA in the Pending Chapter 7 Case.  [Case No. 13-30984, Doc. No. 13; Trustee's Ex. No. 18]. The Debtor signed these Schedules and the SOFA under penalty of perjury, declaring that the information contained therein was true and correct.  [Case No. 13-30984, Doc. No. 13, pp. 44 & 53; Trustee's Ex. No. 18, pp. 44 & 53].

39. On his SOFA, in answer to question number 10,[15] the Debtor made no disclosure about his transfer (i.e., his surrender) of the 2010 Note to MELP on March 11, 2011—a transfer which the Debtor made in order to acquire the warranty deed to Unit 320 from MELP.  [*See* Case No. 13-30984, Doc. No. 13, p. 48; Oct. 1, 2013 Tr. 117:2–17].  Nor did the Debtor make any disclosure about his granting a lien to MELP on Unit 320 (through his execution of the Deed of Trust to secure the $52,880 Note).  [*See* Case No. 13-30984, Doc. No. 13, p. 48; Oct. 1, 2013 Tr. 117:18–117:20].

40. On August 7, 2013, the Debtor amended the SOFA.  [Case No. 13-30984, Doc. No. 88; Trustee's Ex. No. 22; Oct. 1, 2013 Tr. 117:24–118:1].  The amendment set forth that the Debtor began residing at Unit 320 in May of 2012 instead of in 2011, as initially disclosed.  [Oct. 1, 2013 Tr. 118:12–21; *Compare* Case No. 13-30984, Doc. No. 88, p. 5, *with* Case No. 13-30984, Doc. No. 13, p. 49].  The Debtor did **not** amend the SOFA to disclose the transfer of the 2010 Note or the execution and delivery to MELP of the Deed of Trust.  [Oct. 1, 2013 Tr. 118:25–119:10].

---

[15] Item number 10 to the SOFA is entitled "Other transfers" and requires the Debtor to "[l]ist all other property, other than property transferred in the ordinary course of the business or financial affairs of the [D]ebtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case."

41. In the Pending Chapter 7 Case, in both his Original SOFA and Amended SOFA, the Debtor disclosed that he was a defendant in nine lawsuits on the date that he filed his Chapter 7 petition on February 21, 2013. [Case No. 13-30984, Doc. No. 13, pp. 46–47 & Doc. No. 88, pp. 2–3]. Of these nine lawsuits, five of them were listed in the SOFA that the Debtor filed on May 19, 2010 in the Second Chapter 11 Case. *Compare* [Case No. 13-30984, Doc. No. 88, pp. 2–3, *with* Case No. 10-34132, Doc. No. 1, pp. 55– 56]. Thus, there were at least five lawsuits in which the Debtor was a defendant pending at both the time of the initiation of the Second Chapter 11 Case on May 19, 2010 and at the time of the initiation of the Pending Chapter 7 Case on February 21, 2013. Given these circumstances, the Court finds that at the time of the March 11, 2011 Transaction, the Debtor was a party defendant in at least five lawsuits.

42. On his Schedule A in the Pending Chapter 7 Case, the Debtor represents that the value of Unit 320 is $240,598.00. [Case No. 13-30984, Doc. No. 13, p. 3].

43. The Debtor's Schedule D in the Pending Chapter 7 Case represents that the amount of MELP's lien under the Deed of Trust as of the date of the filing of the Chapter 7 petition is $46,715.89; that the amount of the lien held by the MELP HOA is $7,132.40; and that the two liens held by the IRS are $36,899.97 and $8,873.83, respectively. [Case No. 13-30984, Doc. No. 13, pp. 17–18]. The Debtor's Schedule D reflects that the Debtor does not dispute the validity or amounts of MELP's lien or the two liens held by the IRS. *Id.* The Debtor's Schedule D reflects that the Debtor does dispute the HOA lien. *Id.* at 18. However, at the hearing on the Objection, statements by counsel for the Debtor suggest that the Debtor no longer disputes the

HOA lien.  [*See* Dec. 3, 2013 Tr. 81:13–85:19].  Accordingly, the Court finds that the Debtor does not dispute the validity or amount of the HOA lien.

### III. CREDIBILITY OF WITNESSES

Two people testified at the hearing on the Objection: (1) the Trustee; and (2) the Debtor. The Court finds that the Trustee gave very forthright and credible testimony, and therefore gives substantial weight to his testimony.

The Debtor, however, was not entirely forthright and equivocated on some of his responses. His credibility is less than stellar.  For example, in his Schedule B, filed in the First Chapter 11 Case, the Debtor represented that several promissory notes he owned were debts of "doubtful collection."  [Finding of Fact No. 18].  He did not, however, schedule the debt owed to him by MELP as one being of "doubtful collection."[16]  [*Id.*].  Yet, at the hearing on the Objection, the Debtor attempted to convince this Court that the 2008 Note had virtually no value because, in his view, MELP could not pay it.  [Dec. 3, 2013, 17:9–18:9, 24:10–25:6, 32:10–13, 40:15–16 & 62:22–63:17].  Counsel for the Trustee therefore was justified in examining the Debtor as to why he did not schedule the 2008 Note as one being of "doubtful collection" just like he had scheduled several other promissory notes.  The Debtor attempted to dodge the question by claiming ignorance of bankruptcy law:

> Q: And you know how to report something on your Schedules as "doubtful collection," don't you?
>
> A: I don't.  As far as the Bankruptcy Schedules are concerned, I don't -- I've testified before, I don't know the Schedules, per se, it's -- I've provided the information to my attorney firm and they prepared the Schedules so --

[*Id.* at 64:16–21].

---

[16] Nor, for that matter, did the Debtor disclose that the debt owed by MELP was evidenced by a promissory note (i.e., the 2008 Note).  [Finding of Fact No. 18].

Thus, the Debtor—who holds an MBA from the University of Chicago, owns several real estate businesses, is a very sophisticated person, and expressly testified that he provided his attorney with the information contained in these Schedules, and that he reviewed and approved them before his attorney filed them [Findings of Fact Nos. 1–7 & 16]—wants this Court to believe that he did not know how to report that the debt owed to him by MELP was of "doubtful collection." Yet, the Debtor wants this Court to believe him when he testifies that the debt owed to him by MELP had virtually no value because MELP, in his view, could not pay this debt. [Dec. 3, 2013, 17:9–18:9, 24:10–25:6, 32:10–13, 40:15–16 & 62:22–63:17]. If the Debtor really believed that MELP could not pay this debt, then there is no question that the Debtor should have—and could have—scheduled the debt owed to him by MELP as one being of "doubtful collection." He failed to do so. [*See* Findings of Fact Nos. 18 & 27]. By so doing, he has been caught "speaking out of both sides of the mouth." This contradiction undermines his credibility.

The Debtor's credibility is also called into question due to his testimony about the existence of so-called "draft term sheets" relating to the settlement that he negotiated with MELP. The Debtor wants this Court to believe that the settlement that he negotiated with MELP occurred in February of 2010—as opposed to May of 2010.[17] To convince this Court to believe him on this point, the Debtor testified that term sheets were drafted in February of 2010. [Dec. 3, 2013 Tr. 16:2–14 & 60:16–20]. Yet, the Debtor introduced no such draft term sheets to substantiate his testimony. [*Id.* at 18:14–17]. There is no question that if such draft term sheets existed, the Debtor would still have them in his possession and would have introduced them into the record. After all, the Debtor testified that he "turned over thousands of pages to [the

---

[17] The Debtor wants to convince this Court that the settlement actually occurred in February of 2010 so that he can justify the disclosures that he made in the Schedules that he filed on February 24, 2010 in the First Chapter 11 Case. The Court views this tactic as nothing more than trial strategy to attempt now to explain the inaccurate disclosures that the Debtor made in these Schedules—inaccuracies which the Trustee, not the Debtor, has brought to this Court's attention.

Trustee's attorney] . . . . I turned over whatever was requested."  [Dec. 3, 2013 Tr. 61:11–13].

Because the Debtor did not introduce these term sheets into the record, the Court finds that no

such term sheets exist.  The Court views the Debtor's reference to the existence of such term

sheets as nothing more than a disingenuous trial tactic to convince this Court that the settlement

occurred in February of 2010.  This tactic will not work; indeed, it further undermines the

Debtor's credibility.

And then, there is the Debtor's gamesmanship about the existence of the lien that the

Debtor gave to MELP on Unit 320.  The Debtor represented on his Schedule A that on the date

of the filing of the Second Chapter 11 Case (May 19, 2010), there was a $49,000.00 lien on Unit

320.  [Finding of Fact No. 26]; and, at the hearing on the Objection, he testified that this was

MELP's lien [Oct. 1, 2013 Tr. 95:3–5].  Yet, there is no question that the Debtor did **not** execute

the Deed of Trust granting this lien until March 11, 2011 [Finding of Fact No. 33].  Indeed, the

Debtor conceded under cross-examination that on May 19, 2010, he had not executed and

delivered any promissory note or deed of trust to MELP.  [Oct. 1, 2013 Tr. 93:23–94:4].  Thus,

as of May 19, 2010, MELP held no lien whatsoever on Unit 320, and the Debtor should never

have represented in his Schedule A that a lien on Unit 320 existed.

Aside from the fact that the Debtor's testimony contradicts his representation on

Schedule A, he digs himself into an even greater credibility hole with respect to his Schedule D

that he filed in the Second Chapter 11 Case.  This Schedule, which is entitled "Creditors Holding

Secured Claims," requires the disclosure of the names of, the addresses of, and the amounts

owed to all secured creditors.  If the Debtor really believed that MELP had a $49,000.00 lien on

Unit 320 as of May 19, 2010—and that is what he represented on Schedule A—then Schedule D

required him to list it.  Yet, he did not do so.  Set forth below is the exchange between the

Trustee's counsel and the Debtor about his failure to disclose this lien on Schedule D:

> Q: Okay.  Please turn to page 18, your Schedule D of creditors holding secured
> claims.  I want you to show the Court where on this Schedule D you disclosed the
> identity of the secured creditor holding the $49,000 secured claim on Unit 320.
>
>      (Pause.)
>
> A: I believe the secured claim was the, was the -- in the Settlement Agreement in
> the Contract for Deed.  But there's no listing of the secured -- and it was an offset,
> but there's no listing of a specific Deed of Trust or secured claim here.
>
> Q: Okay.  And that's because the secured claim didn't exist yet, did it?
>
> A: I actually believe it did exist, but may be caught up in the definition of what a
> secured claim is.

[Oct. 1, 2013 Tr. 94:5–19].  The Debtor, a sophisticated real estate developer and real estate

broker, who has been involved in numerous transactions over many years [Findings of Fact Nos.

3–7], attempts to explain away his deception by resorting to obfuscation and pettifogging.  It will

not work.

Additionally, the Debtor undermined his credibility when he contradicted himself about

the $52,880.00 Note and Deed of Trust.  On the Schedule A that he filed in the Second Chapter

11 Case, he represented that he owed MELP a secured debt totaling $49,000.00.[18] [Finding of

Fact No. 26].  But, at the hearing on the Objection, the Debtor testified that as of May 19, 2010

(i.e., the date that the Debtor filed the Second Chapter 11 Case), he had not executed any

promissory note or deed of trust for MELP's benefit.  [Oct. 1, 2013 Tr. 93:23–94:4].  Indeed, the

Debtor testified at the hearing that it was on March 11, 2011—approximately ten months after

May, 19, 2010—that he executed and delivered a promissory note (i.e., the $52,880.00 Note) and

---

[18] Schedule A does not actually reference MELP's name, but simply references a $49,000.00 lien.  However, the
Debtor testified that the creditor holding the $49,000.00 secured claim referred to in Schedule A was MELP. [Oct. 1,
2013 Tr. 94:23–95:5].

deed of trust (i.e., the Deed of Trust) to MELP.  [*Id.* at 111:5–13; *see also* Trustee's Ex. No. 13].

Once again, the Debtor's testimony directly contradicts his sworn statements in the Schedules.

And, once again, the contradiction between what the Debtor wrote under oath and what he said

under oath casts a pall on his credibility.

But there is more.  In addition to wanting this Court to believe that he is ignorant of his

fundamental duty to make accurate disclosures under oath, the Debtor wants to lay the blame for

any inaccuracies or omissions on his former bankruptcy counsel.[19]  For example, the Debtor gave

the following testimony in response to questions from his present counsel of record:

> Q: All right.  In any of the Schedules that have been submitted to the courts, how much did you wrote [sic]?
>
> A: I didn't draft these Schedules.  I didn't write the Schedules.
>
> Q: Who did?
>
> A: The people at the Fuqua Law Office.

[Dec. 3, 2013 Tr. 68:14–19].

Thus, despite admitting that he provided all of the information to his attorney at the

Fuqua Law Firm, P.C., and that he reviewed and approved the completed Schedules prior to his

attorney filing them [Findings of Fact Nos. 16, 25 & 32], the Debtor wants this Court to believe

that his former attorney—not the Debtor himself—is responsible for any inaccuracies in the

Schedules.  This, the Court will not believe.  Rather, by taking this disingenuous approach, the

Debtor leads this Court to find that his credibility is woefully lacking.[20]

---

[19] The attorney who represented the Debtor in the First Chapter 11 Case and the Second Chapter 11 Case was Richard Fuqua (Fuqua), who is a principal at the Fuqua Law Firm, P.C.  The Debtor chose a different law firm (Wyatt & Gracey, P.C.) to represent him in the Pending Chapter 7 Case.

[20] This Court notes that the very question posed by the Debtor's counsel in the Pending Chapter 7 Case is somewhat disingenuous itself.  The question posed was whether the Debtor, himself, wrote the Schedules in his prior bankruptcy case that were filed with this Court—which allowed the Debtor to conveniently say "I didn't draft these Schedules.  I didn't write the Schedules."  [Dec. 3, 2013 Tr. 68:14–17].  In fact, very few debtors who are

Finally, the Debtor's credibility is seriously called into question based upon the testimony that he gave about whether he acquired fee simple title to Unit 320 on May 19, 2010. On the Schedule A that was filed in the Second Chapter 11 Case, he represented that he had a "Fee Simple" interest in Unit 320. [Finding of Fact No. 26]. But, at the hearing on the Objection, when the Trustee's counsel asked him whether he had received fee simple title to Unit 320 on May 19, 2010, the Debtor responded: "No." [Oct. 1, 2013 Tr. 88:19–22]. If this contradiction does not undermine the Debtor's credibility, then nothing does.

For all of the reasons set forth above, the Court finds that the Debtor's testimony is not very credible—certainly not as credible as the Trustee's testimony. Therefore, the Court gives substantially more weight to the Trustee's testimony than to the Debtor's testimony. Moreover, even on issues about which the Debtor testified but the Trustee did not, this Court gives either no weight, or little weight, to the Debtor's testimony.

## IV. CONCLUSIONS OF LAW

### A.    Jurisdiction, Venue, and Constitutional Authority to Sign a Final Order

1.    <u>Jurisdiction</u>

This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a). This dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2) (A), (B), and (O).

2.    <u>Venue</u>

Venue is proper pursuant to 28 U.S.C. § 1408(1).

---

represented by counsel actually fill out the Schedules in their own handwriting, with counsel then filing these handwritten Schedules with the court. Rather, what typically happens—and what happened here, as shown by the Debtor's own testimony—is that: (a) the Debtor provided the information to Fuqua; (b) Fuqua, or one of his assistants, entered this information onto the Schedules; (c) the Debtor then reviewed the Schedules; (d) the Debtor approved the filing of these Schedules; and (e) Fuqua, or one of his assistants, then filed the Schedules by uploading them on the CM/ECF system.

3.  <u>Constitutional Authority to Enter a Final Order</u>

There is no question that "[a]n order sustaining an objection to a debtor's claimed exemption is a final order."  *Wood v. Premier Capital, Inc. (In re Wood)*, 291 B.R. 219, 223 (B.A.P. 1st Cir. 2003) (citations omitted).

*Stern v. Marshall*, 131 S. Ct. 2594 (2011), sets forth certain limitations on the constitutional authority of bankruptcy courts to enter final orders.  This Court must therefore determine whether it has constitutional authority to enter a final order in the dispute at bar.  This Court concludes that it does for the following reasons.

In *Stern*, the debtor, pursuant to 28 U.S.C. § 157(b)(2)(C), filed a counterclaim based solely on state law, and the resolution of this counterclaim did not necessarily resolve the validity or invalidity of the defendant's claim.  Under these circumstances, the Supreme Court held that the bankruptcy court lacked constitutional authority to enter a final order on the debtor's counterclaim.

In the case at bar, the Objection is based upon an express provision of the Code—11 U.S.C. § 522(o).  This provision is solely a creature of the Code, having become law in 2005 when Congress passed BAPCPA.  Thus, this dispute is easily distinguishable from the suit in *Stern*, and the Court concludes that *Stern* is inapplicable in the case at bar.[21]    The Court therefore has the constitutional authority to enter a final order on the Objection.  *See, e.g.*, *In re Carile*, No. 13–13986, 2013 WL 6253768, at *1 (Bankr. N.D. Ohio Dec. 4, 2013); *In re Carlew*, 469 B.R. 666, 672 (Bankr. S.D. Tex. 2012), *aff'd sub nom. W. v. Carlew*, Civ. Action No. H–12–0913, Bankr. Case No. 11–37886–H4, 2012 WL 3002197 (S.D. Tex. July 23, 2012); *In re Hill*, No. 08–36267, 2011 WL 6936357, at *6 (Bankr. S.D. Tex. Dec. 30, 2011) ("In the case at bar,

---

[21] As will be discussed subsequently herein, there is some state law used in evaluating two of the four elements of § 522(o), but this fact alone does not bring this dispute within the fact pattern of *Stern* to the degree that the *Stern* holding applies here.

there are both facts and law that give this Court  constitutional authority to sign a final order on the Objection to Exemptions.").

In the alternative, even if *Stern* somehow applies, this Court concludes that the one exception articulated in *Stern* by the Supreme Court in applicable here—specifically, that this Court may enter a final order over essential bankruptcy matters under the "public rights" exception.  Under *Thomas v. Union Carbide Agric. Prods. Co.*, a right closely integrated into a public regulatory scheme may be resolved by a non-Article III tribunal.  473 U.S. 568, 593 (1985).  The Code is a public scheme for restructuring debtor-creditor relations, necessarily including "the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts."  *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64 (2006); *see N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982) (plurality opinion) (noting in dicta that the restructuring of debtor-creditor relations "may well be a 'public right'").  *But see Stern*, 131 S. Ct. at 2614, n.7 ("We noted [in *Granfinanciera*] that we did not mean to 'suggest that the restructuring of debtor-creditor relations is in fact a public right.'").

Disputes that are integrally bound up in the claims adjudication process—and thus involve the exercise of the Bankruptcy Court's *in rem* jurisdiction over the estate—are part of the "public rights" exception. *See Stern*, 131 S. Ct. at 2618 (noting that when determining whether Congress may bypass Article III, "the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims adjudication process").  Disputes over rights created by the Code itself as part of the public bankruptcy scheme also fall within the "public rights" exception.  *See Thomas*, 473 U.S. at 593 (allowing non-Article III adjudication of

rights created by a public regulatory scheme). For example, the Code contains provisions expressly allowing debtors to claim exemptions on property of the estate, and the Code also contains provisions—such as § 522(o)—expressly limiting the extent of exemptions that the debtor may claim. These are rights that fall within the "public rights" exception. Bankruptcy courts may enter final orders on disputes over such rights.

For all of these reasons, this Court has constitutional authority to enter a final order on the Objection.

**B.      The Trustee Has Proven All of the Elements of § 522(o)**

Section 522(o), in pertinent part, states as follows:

> [T]he value of an interest in real or personal property that the debtor . . . uses as a residence . . . or . . . claims as a homestead shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt . . . if on such date the debtor had held the property so disposed of.

11 U.S.C. § 522(o) (2010).

This language indicates that, to prevail under § 522(o), four elements must be proven: (1) the debtor disposed of property within ten years preceding the bankruptcy filing; (2) the disposed property was non-exempt; (3) some or all of the proceeds from the disposition of this non-exempt property were used to buy a new homestead, to improve an existing homestead, or reduce the debt associated with an existing homestead; and (4) the debtor disposed of the non-exempt property with the intent to hinder, delay, or defraud a creditor. *In re Sissom*, 366 B.R. 677, 688 (Bankr. S.D. Tex. 2007). To prevail under § 522(o), the Trustee, as the objecting party, bears the burden of proving these four elements by a preponderance of the evidence. FED. R. BANKR. P. 4003(c); *Cipolla v. Roberts (In re Cipolla)*, 476 F. App'x. 301, 305 (5th Cir. 2012); *see also In re Sissom*, 366 B.R. 677, 689 (Bankr. S.D. Tex. 2007); *In re Lacounte*, 342 B.R. 809,

28

813–14 (Bankr. D. Mont. 2005).   For the reasons discussed below, this Court finds that the Trustee has successfully proven each of these elements.

      1.      <u>Element #1: The Debtor Disposed of Property (i.e. the 2010 Note) Within Ten Years Before Filing His Chapter 7 Petition</u>

The Debtor filed the Pending Chapter 7 Case on February 21, 2013.  [Finding of Fact No. 37].  On March 11, 2011, the Debtor disposed of the property at issue here (i.e. the 2010 Note) by delivering it to MELP, marked "Pd in full."  [Finding of Fact No. 33].  Thus, the Debtor disposed of the 2010 Note within two years preceding the filing of his Chapter 7 petition. Accordingly, the Trustee has easily met the first requirement of § 522(o) by establishing that the disposition occurred within ten years preceding the filing of the Debtor's Chapter 7 petition.

      2.      <u>Element #2: The Debtor Disposed of Property (i.e. the 2010 Note) that was Non-exempt</u>

In prior cases involving the intersection of Texas homestead law and § 522(o) of the Code, this Court has addressed the disposition of non-exempt property in the form of cash.  *See In re Presto*, 376 B.R. 554 (Bankr. S.D. Tex. 2007); *In re Sissom*, 366 B.R. 677 (Bankr. S.D. Tex. 2007).  In the case at bar, the non-exempt property at issue takes the form of a promissory note (i.e., the 2010 Note).

On May 18, 2010, the Debtor entered into the CSA with MELP, under which the Debtor cancelled the 2008 Note—by marking it "Cancelled" and delivering it to MELP—and MELP, in return, gave the Debtor a replacement note in the same amount  (i.e., the 2010 Note).  [Findings of Fact Nos. 20 & 21].  On this same day, the parties, pursuant to the CSA, executed the Contract for Deed, which gave the Debtor the right to purchase Unit 320 for $289,000.00.  [Finding of Fact No. 21].   The Contract for Deed set forth that this amount could be paid as follows: (a) the Debtor could credit the outstanding balance due under the 2010 Note against the price of

$289,000.00; (b) the Debtor could execute and deliver to MELP a promissory note for the remaining amount of the purchase price to MELP; and (c) the Debtor would execute and deliver a deed of trust on Unit 320 to MELP securing this promissory note.  [Finding of Fact No. 21].

The Debtor did, in fact, satisfy the three conditions referenced above by delivering to MELP the 2010 Note with the handwritten phrase, "Pd in full," and also by executing and delivering  to MELP the $52,880 Note and the Deed of Trust.  [Finding of Fact No. 33].  The Debtor took these actions on March 11, 2011; and once the Debtor did so, MELP, on this same day, executed and delivered a general warranty deed to the Debtor conveying Unit 320 to him. [*Id.*].  Thus, the Debtor acquired Unit 320 from MELP by disposing of the 2010 Note—i.e., through releasing MELP from its obligation under the 2010 Note.[22]  Yet, the Texas Property Code does not allow a debtor to exempt promissory notes which that debtor owns; the funds owed to that debtor under such notes, when collected, are non-exempt finds that must be used to pay creditors.  *See* Tex. Prop. Code Ann. § 42.002.[23]

Accordingly, the Trustee has met the second requirement of § 522(o) by establishing that the property disposed of by the Debtor—here, the 2010 Note—was non-exempt property.

3.      Element #3: The Non-exempt Property (i.e., the 2010 Note) Was Used to Pay for a Portion of a Homestead (i.e., Unit 320)

In each of the cases this Court has previously decided under § 522(o), the debtor reduced non-exempt property to its liquid value by a sale, and then used these funds to purchase a homestead.  *See In re Presto*, 376 B.R. 554 (Bankr. S.D. Tex. 2007); *In re Sissom*, 366 B.R. 677 (Bankr. S.D. Tex. 2007).  The facts of the instant case present a more efficient transaction, in

---

[22] This transaction had the same practical effect as if the Debtor had paid cash of $236,120.00 to MELP (i.e., the balance of the 2010 Note as of March 11, 2011) in order to acquire the warranty deed to Unit 320.

[23] Section 42.002 of the Texas Property Code sets forth a list of property that may be exempt, such as home furnishings and firearms.  [*Id.*].  This list does **not** include promissory notes which a debtor owns.

which the Debtor has used the non-exempt property itself (i.e., the 2010 Note), without liquidating this asset, to purchase his alleged homestead (i.e., Unit 320).  [*See* Finding of Fact No. 33].

Indeed, the Debtor admitted that he transferred the 2010 Note to MELP on March 11, 2011 as payment for a portion of Unit 320's purchase price.  [Oct. 1, 2013 Tr. 110:16–21].  Pursuant to the Contract for Deed, the Debtor's surrender of the 2010 Note to MELP satisfied $236,120.00 of the purchase price of $289,000.00.  [Findings of Fact Nos. 20, 21 & 33].  To pay the remaining balance of the purchase price, the Debtor executed and delivered to MELP a promissory note for $52,880.00 (i.e., the $52,880 Note).[24]  [Finding of Fact No. 33].

The Trustee has therefore shown that the Debtor used a non-exempt asset—i.e., the 2010 Note—to pay for a substantial portion (81.7%) of the purchase price[25] for the alleged exempt asset, i.e., Unit 320.  Accordingly, the Trustee has easily satisfied the third element of § 522(o).

4.    Element #4: The Debtor Disposed of Non-exempt Property (i.e., the 2010 Note) With the Intent to Hinder, Delay, or Defraud His Creditors

A trustee may establish the fourth requirement of § 522(o) by direct, or indirect, evidence.  *See, e.g.*, *In re Presto*, 376 B.R. 554, 569 (Bankr. S.D. Tex. 2007); *In re Sissom*, 366 B.R. 677, 692 (Bankr. S.D. Tex. 2007).  To do so by direct evidence would require the Trustee to adduce testimony from the Debtor to the effect that he disposed of the 2010 Note to acquire Unit 320 with the intent to hinder, delay, or defraud his creditors.  It would be highly unusual to acquire sufficient proof from the Debtor himself—either through testimony or writings—of his intent to hinder, delay, or defraud his creditors.  *See e.g.*, *Gillman v. Ford (In re Ford)*, 492 F.3d 1148, 1157 (10th Cir. 2007) ("The problem in ascertaining whether a debtor acted with

---

[24]  Subtracting the amount owed under the 2010 Note (which was $236,120.00) from the purchase price of $289,000.00 results in a remaining balance of $52,880.00.

[25]  $236,120.00 ÷ $289,000.00 = 0.817 x 100 = 81.7%.

fraudulent intent is difficult because, ordinarily, the debtor will be the only person able to testify directly concerning his intent and he is unlikely to state that his intent was fraudulent.") (citation omitted).  Indeed, in the case at bar, the Debtor, not surprisingly, expressly testified at the hearing on the Objection that he never intended to hinder, delay, or defraud his creditors when he disposed of the 2010 Note in order to acquire Unit 320.[26]  [Dec. 3, 2013 Tr. 39:14–18].  Thus, the Trustee cannot establish by direct evidence that the Debtor intended to hinder, delay, or defraud his creditors.

This is not, however, the end of the analysis.  Case law is clear that parties may establish intent by inference from specific indicia of fraud based on all of the facts and circumstances.  *See In re Ford,* 492 F.3d at 1157 ("Therefore, fraudulent intent may be deduced from the facts and circumstances of a case.") (citation omitted); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1070 (5th Cir. 1987) ("Although the defendant's state of mind is a subjective fact, it can be shown by indirect or circumstantial evidence.") (citing *Herbert v. Lando*, 441 U.S. 153, 165 (1979)); *United States v. Shaddix*, 693 F.2d 1135, 1138 (5th Cir. 1982) ("Because no one has a window to a man's mind, knowledge must often be proved by indirect evidence.") (quoting *United States v. Richards*, 638 F.2d 765, 769 (5th Cir.1981), *cert. denied*, 454 U.S. 1097 (1981)).  Thus, in the case at bar, this Court must focus on indirect evidence of the Debtor's intent to hinder, delay, or defraud his creditors.  *Cipolla v. Roberts (In re Cipolla)*, 476 F. App'x 301, 306 (5th Cir. 2012) ("And, because direct evidence of intent is usually unavailable, actual intent may be inferred from circumstantial evidence.").

---

[26] When the Debtor's counsel asked the Debtor the following question: "Sir, at any time during either of your Chapter 11 cases, did you have intent to defraud, hinder or delay [c]reditors by the way that the [MELP] matter was handled?" the Debtor, not surprisingly, stated, "No."  [Dec. 3, 2013 Tr. 39:14–18].  The Court gives no weight to this testimony, as the Court finds the Debtor's credibility to be woefully lacking.  *See* Section III regarding "Credibility of Witnesses."

In doing so, this Court looks to the ten factors articulated in the Texas Uniform Fraudulent Transfer Act (TUFTA), TEX. BUS. & COM. CODE ANN. § 24.001 *et seq.*, as well as three factors identified by other courts and adopted previously by this Court.  *See In re Presto*, 376 B.R. 554, 569 (Bankr. S.D. Tex. 2007) (considering thirteen potential badges of fraud pursuant to the analysis in *Sissom*); *In re Sissom*, 366 B.R. 677, 692–93 (Bankr. S.D. Tex. 2007) (considering ten badges of fraud listed in TUFTA and three additional badges focused on by other bankruptcy courts that have interpreted § 522(o)).  TUFTA expressly states that the factors it lists are non-exhaustive, *see* TEX. BUS. & COM. CODE ANN. § 24.005(b), and the Fifth Circuit has likewise held that they are "non-exclusive," *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1066 (5th Cir. 2008).  As importantly, the Fifth Circuit has noted that "[n]ot all, or even a majority, of the 'badges of fraud' must exist to find actual fraud." *Id.* at 1067.  Rather, "[w]hen several of these 'badges of fraud' are present, a court may properly infer fraudulent intent." *Metal Bldg. Components, LP v. Raley*, No. 03-05-00823-CV, 2007 WL 74316, at *6 (Tex. App.—Austin Jan. 10, 2007, no pet.) (citing *Mladenka v. Mladenka*, 130 S.W.3d 397, 405 (Tex. App.—Houston [14th Dist.] 2004, no pet.)).  The Court now analyzes these thirteen badges of fraud with respect to the dispute at bar to determine if the Trustee has established the existence of a sufficient number of these badges to warrant a finding that the Debtor intended to hinder, delay, or defraud his creditors.

### a.    THE FIRST BADGE: Was the transfer to an insider?

The transfer at issue is the Debtor's delivery of the 2010 Note stamped "Pd in full" to MELP [Finding of Fact No.33].  Accordingly, this Court must focus on whether MELP is an insider.  The Trustee has introduced no evidence that MELP is an insider.  Moreover, the Debtor gave testimony that he held no ownership interest or management interest in MELP, nor had he

33

ever received compensation or dividends from MELP. [Oct. 18, 2013 Tr. 10:5–14 & 10:19–22]. Further, the Debtor testified that he was not a member, shareholder, officer, director or manager of MELP nor did he ever acquire such an interest or hold such a duty regarding MELP. [*Id.* at 11:10–16]. Given this record, the Court concludes that MELP is not an insider. Therefore, this badge is not present.

### b.  THE SECOND BADGE: Did the Debtor retain possession or control of the property after the transfer?

The property at issue is the 2010 Note. On March 11, 2011, the Debtor delivered the 2010 Note, marked "Pd in full," to MELP in exchange for MELP delivering to the Debtor the warranty deed to Unit 320. [Finding of Fact No. 33]. By surrendering the 2010 Note to MELP, the Debtor necessarily did not retain possession or control of the 2010 Note. Therefore, this badge is not present.

### c.  THE THIRD BADGE: Was the transfer concealed?

Based on the evidence introduced by the Trustee, this Court finds that the Debtor actively concealed his transfer of the 2010 Note to purchase Unit 320. Even though the transfer of the 2010 Note to MELP did not occur until March 11, 2011 [Finding of Fact No.33], the Debtor actually began concealing this transfer as early as February of 2010, when he filed the first Chapter 11 Case. Therefore, it is necessary to review certain misrepresentations of the Debtor in both the First Chapter 11 Case and the Second Chapter 11 Case, even before addressing the misrepresentations made in the Pending Chapter 7 Case.

#### i.  *The Debtor's Misrepresentations in the First Chapter 11 Case*

The deception began as early as February 24, 2010, when the Debtor affirmatively represented on Schedule A of the First Chapter 11 Case that he owned an unencumbered, fee

simple interest in Unit 320 and that a Contract for Deed existed with respect to this unit.[27] [Findings of Fact Nos. 15–17]. In fact, however, the Debtor did **not** own an unencumbered fee simple interest in Unit 320 at this time and there was **no** Contract for Deed in place.[28] [Oct. 1, 2013 Tr. 77:16–22]. Indeed, on February 24, 2010, the Debtor had **no** interest whatsoever in Unit 320. The Debtor's misrepresentation that he had a fee simple interest in Unit 320 and that a Contract for Deed existed is important for this reason. By making this false disclosure, any creditor or trustee subsequently assessing the Debtor's acquisition of Unit 320 could be baffled—particularly if he or she was examining the transaction that took place on March 11, 2011, when the Debtor really did acquire the warranty deed (i.e., the fee simple interest) for Unit 320 [Finding of Fact No. 33]. Stated differently, the Debtor's misrepresentation in February of 2010 obfuscated what the Debtor actually owned at that time—causing the Trustee to spend significant time sorting out the truth about the Debtor's transfer of the 2010 Note when he (i.e., the Trustee) began scrutinizing the Debtor's homestead exemption claim in the Pending Chapter 7 case.

---

[27] At the hearing on the Objection, the Trustee testified that he interpreted the Debtor's description of his interest in Unit 320 on Schedule A as indicating that the Debtor had a fee simple interest in Unit 320 and that he had entered into a contract for deed to sell Unit 320 to some third party. [Sept. 4, 2013 Tr. 37:14–34:14]. As previously noted, the Court agrees with the Trustee's interpretation. *See supra* note 5.

[28] The Debtor testified that he believed he did have an interest in Unit 320 as of February 24, 2010 because he had a verbal agreement with MELP at that time, and this verbal agreement eventually resulted in the drafting of the CSA and the Contract for Deed, both of which documents were executed in May of 2010 [Dec. 3, 2013 Tr. 16:2–14 & 60:16–20; *see also* Findings of Fact Nos. 21 & 22]. The problem with this testimony is twofold. First, one cannot have an interest in real property unless it is evidenced by a written document. *See Gomez v. Kamper Invs., LLC (In re Gomez)*, 388 B.R. 279, 283 (Bankr. S.D. Tex. 2008) ("For any interest in real property to be transferred, the conveyance must be 'in writing, signed by the grantor, and delivered to the grantee.'") (quoting *Adams v. First Nat'l Bank of Bells/Savoy*, 154 S.W.3d 859, 869 (Tex. App.—Dallas 2005, no pet.)). The Debtor—as a sophisticated person well-versed in real estate transactions [Findings of Fact Nos. 1–7]—knew, or should have known, of this fundamental rule of real estate ownership; indeed, he testified that he has never been at a closing on a real estate transaction where documents have not been signed. [Dec. 3, 2013 Tr. 54:13–55:6, 55:13–17, 56:2–16]. Second, even if the Debtor could have an interest in Unit 320 based upon this alleged verbal agreement, the interest, according to the Debtor's own testimony, was a Contract for Deed, not a fee simple interest! [Oct. 1, 2013 Tr. 53:25–54:5 & 123:24–126:22; Dec. 3, 2013 Tr. 16:6–12 & 53:17–21]. Therefore, the Debtor, as a sophisticated real estate broker and developer, never should have represented that he had a fee simple interest in Unit 320 on Schedule A in the First Chapter 11 Case.

There is more. The Debtor listed MELP's debt of $286,847.92 on Schedule B of the First Chapter 11 Case, but he failed to disclose that a promissory note evidenced this debt—i.e., the 2008 Note. [Finding of Fact No. 18]. This omission is important because, once again, any creditor or trustee subsequently assessing the Debtor's acquisition of Unit 320 could be easily confused—particularly if he or she was examining the March 11, 2011 Transaction when the Debtor transferred the 2010 Note. Stated differently, when the Trustee began investigating the legitimacy of the Debtor's homestead exemption claim in the Pending Chapter 7 Case, he could not at all discern the relationship among the 2008 Note, the 2010 Note, and the Debtor's acquisition of Unit 320 because the Debtor never disclosed that the obligation owed by MELP to him was in the form of a promissory note. The Debtor hid the existence of the 2008 Note so that no one would be able to discern that he would be using this Note to obtain another Note (i.e., the 2010 Note) in order to acquire Unit 320.[29] [*See* Findings of Fact Nos. 10, 18, 20, 21, 27, 29, 30, 32, 33, 34]. The Trustee had to spend considerable time ferreting out this information.

The Debtor contends that because he himself did not sign the Schedules filed in the First Chapter 11 Case, he committed no deception; and that any inaccuracies about what interest he had in Unit 320 or any failure to disclose the 2008 Note are due to his attorney's negligence. [*See* Dec. 3, 2013 Tr. 68:14–19 & 75:24–76:14]. This Court disagrees. First, although the Debtor himself did not sign the Schedules, his attorney did, [*see* Finding of Fact No. 16 & *supra*

---

[29] On February 24, 2010, the Debtor and MELP had not yet settled the State Court Lawsuit, but they were in negotiations to try to settle this dispute. Indeed, the Debtor testified that considerable negotiations took place in January of 2010, and the parties were discussing the contours of a settlement whereby the Debtor would be able to eventually acquire Unit 320 in exchange for his reducing the debt owed to him by MELP. [Oct. 1, 2013 Tr. 124:2–21]. Thus, even before the Debtor initiated the first Chapter 11 Case on February 24, 2010, he knew that negotiations had progressed to the point that even though no settlement had been definitively reached and reduced to writing, there was a possibility that negotiations would lead to a definitive, written, and fully executed settlement whereby he would be able to acquire Unit 320 through forgiving whatever amount of debt MELP owed to him. At this time, the debt that MELP owed to the Debtor was evidenced by the 2008 Note. This Court finds that the Debtor concluded that it would be best **not** to disclose the existence of the 2008 Note when he initiated the First Chapter 11 Case so that he could eventually surreptitiously exchange it for the 2010 Note and thereafter surrender the 2010 Note to MELP in order to acquire the warranty deed to Unit 320.

note 4]; and the Debtor is bound by the misrepresentations and inaccurate disclosures of his chosen attorney.  *See, e.g.*, *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396 (1993) ("[C]lients must be held accountable for the acts and omissions of their attorneys."); *Link v. Wabash R. Co.*, 370 U.S. 626, 633–34 (1962) ("[The client] voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent.").  Second, the Debtor provided this information to his attorney, [Finding of Fact No. 16]; therefore, it is not as if the Debtor had no hand in the disclosure of this inaccurate information.  Third, if the Debtor's attorney (at this time, it was Fuqua) really had concocted the bogus information without any assistance from the Debtor, this Court wonders why the Debtor—an extremely sophisticated individual who has experience hiring attorneys[30]—retained the same attorney to represent him in the Second Chapter 11 Case.  Indeed, the First Chapter 11 Case was dismissed due to the Debtor's failure to file all of his Schedules and his SOFA by the March 10, 2010 deadline.  [Finding of Fact No. 19].  If this dismissal really resulted due to solely his attorney's negligence, and if this attorney really concocted the misinformation on Schedule B, then surely the Debtor would not have retained this same attorney to represent him in the Second Chapter 11 Case.  His retention of this same attorney for the Second Chapter 11 Case speaks volumes to this Court; and his attempt now to blame his prior attorney is nothing more than a litigation tactic to defeat the Trustee's effort at proving his deception.  This strategy will not work.

---

[30] The Debtor has hired at least four attorneys to represent him.  Specifically, the Debtor hired Richard Fuqua to represent him in the First Chapter 11 Case and the Second Chapter 11 Case.  *See supra* note 19.  Then, in the Second Chapter 11 Case, when three financial institutions filed suit against the Debtor to prevent discharge of certain obligations, the Debtor retained Kevin L. Colbert (Adv. Pro. Nos. 10-03583, 10-03584, 10-03585).  Moreover, the Trustee's Ex. No. 9 reflects that the Debtor also retained an attorney in Sante Fe, New Mexico, William J. Arland, who doubtless was representing the Debtor in the litigation involving the Debtor in New Mexico.  Finally, in the Pending Chapter 7 Case, the Debtor retained the law firm of Wyatt & Gracey, P.C.  *See supra* note 19.

        ii.    *The Debtor's Misrepresentations in the Second Chapter 11 Case*

Even assuming that the Debtor is not bound by the actions of his attorney in the First Chapter 11 Case, the Debtor **did** sign his Schedules and SOFA in the Second Chapter 11 Case [Finding of Fact No. 25], and a review of these documents underscores his attempt to conceal key information about his transfer of the 2010 Note to acquire Unit 320.

First, the Debtor omitted the Contract for Deed on his Schedule G. [Finding of Fact No. 29]. In Texas, land sale contracts are construed as executory contracts, and debtors who file for bankruptcy in Texas must disclose such contracts on their Schedule G. *Rancho Chamberino, Inc. v. B.F.W. Enters., Inc. (In re Rancho Chamberino, Inc.)*, 89 B.R. 597, 600 (W.D. Tex. 1987); *In re Wells*, 426 B.R. 579, 603 (Bankr. N.D. Tex. 2006) (noting that the debtor was required to disclose the executory contract on Schedule G, but he failed to do so); *In re Hendrickson*, No. 04–81261–BJH–13, 2005 WL 3670876, at *2 (Bankr. N.D. Tex. May 24, 2005); *In re Waldron*, 65 B.R. 169, 172 (Bankr. N.D. Tex. 1986); *Turoff v. Sheet (In re Sheets)*, 277 B.R. 298, 303 (Bankr. N.D. Tex. 2002); *In re Finley*, 138 B.R. 181, 182 (Bankr. E.D. Tex. 1992) ("[A]fter a review of relevant Texas law, this Court can come to no other conclusion but that a contract for deed is an executory contract under Texas law."). By failing to disclose the Contract for Deed on his Schedule G, the Debtor prevented his creditors from ever knowing about the Contract for Deed and the express reference to the 2010 Note contained therein; and by hiding this information from his creditors, these creditors would never know that the Debtor had the right to exchange the 2010 Note for the warranty deed to Unit 320. Thus, on March 11, 2011, when the Debtor did subsequently transfer the 2010 Note to MELP [Finding of Fact No. 33], the Debtor's creditors were totally in the dark about this transaction. Under these circumstances, the Court finds that the Debtor concealed the transfer of the 2010 Note.

38

Second, the Debtor failed to disclose that he transferred the 2008 Note to MELP in exchange for the 2010 Note.  [Finding of Fact No. 30].  The Debtor should have disclosed this transfer in responding to item number 10 of the SOFA, which requires the Debtor to "[l]ist all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case."[31]  By concealing the transfer of the 2008 Note, the Debtor thereby concealed the existence of the 2010 Note, and therefore, concealed the eventual transfer of the 2010 Note to MELP in exchange for acquiring the warranty deed to Unit 320.

Third, in his Schedule A, the Debtor once again represented that he held a fee simple interest in Unit 320 [Finding of Fact No. 26], but his new, contractual interest in Unit 320 once again fell short of a fee simple interest.  The CSA and the Contract for Deed reflect that on the date of the filing of the Second Chapter 11 Case, the Debtor's interest in Unit 320 was **not** a fee simple interest, but rather a contractual right to purchase Unit 320 if he satisfied certain conditions in the future.  [*See* Findings of Fact Nos. 20, 21, 22 & 33].  If a creditor had known about the CSA and the Contract for Deed, the creditor would have known that the Debtor did **not** own a fee simple interest in Unit 320, but rather had a right to subsequently purchase the fee simple interest by, among other means, transferring the 2010 Note to MELP as part of the purchase price.  Thus, by falsely representing that on May 19, 2010 he owned a fee simple interest in Unit 320 [Findings of Fact Nos. 24, 25 & 26], the Debtor concealed from his creditors that he would subsequently be transferring the 2010 Note to MELP in order to acquire a fee simple interest in Unit 320.

---

[31] The Debtor's explanation for his failure to disclose his transfer of the 2010 Note is that the exchange of this Note for the 2010 Note was in the ordinary course of his real estate business and that the language in item 10 of the SOFA expressly excludes the need to disclose transfers made in the ordinary course of business.  [Oct. 1, 2013 Tr. 103:18–104:9 & 104:16–24].  In Section IV(C)(1), this Court addresses the "ordinary course of business" defense and explains why the Debtor cannot successfully assert it.

Fourth, the Debtor further dissembled by his representations in Schedule A of a nonexistent claim for $49,000.00 secured by Unit 320.  [Finding of Fact No. 26].  This representation was patently false.  On the date of the filing of the Second Chapter 11 Case (i.e., May 19, 2010), no creditor held a $49,000 lien on Unit 320.  [*See* Finding of Fact No. 33].  The Debtor testified that this $49,000 lien belonged to MELP, but this testimony is not credible for two reasons.  [*Id.*].  First, MELP did not acquire a lien on Unit 320 until March 11, 2011 when the Debtor executed and delivered the Deed of Trust to MELP.  [*Id.*].  Second, the amount of lien was **not** $49,000.00, but rather $52,880.80, as evidenced by not only the Deed of Trust, but by the $52,880.00 Note that the Debtor executed and delivered to MELP on March 11, 2011.  [*Id.*].  Thus, by leading his creditors to believe that a $49,000.00 lien already existed on Unit 320 as of May 19, 2010, the Debtor concealed that he subsequently gave MELP a lien of $52,880.00 pursuant to the Deed of Trust—the amount of which lien was determined after the balance of the undisclosed 2010 Note was first applied against the purchase price of $289,000.00 [*see id.*].

Fifth, Schedule B represented that MELP owed $37,543.56 to the Debtor.  [Finding of Fact No. 27].  This representation was also patently false.  On the date of the commencement of the Second Chapter 11 Case, MELP owed $276,500.48 to the Debtor—which was the face amount of the 2010 Note acquired by the Debtor the previous day when he exchanged the 2008 Note for the 2010 Note [Findings of Fact Nos. 21 & 33].  Thus, by falsely representing that MELP did not owe $276,500.48 on May 19, 2010, the Debtor concealed the existence of the 2010 Note, which thereby concealed the Debtor's transfer of the 2010 Note on March 11, 2011 to MELP in exchange for acquiring the warranty deed to Unit 320.

The Debtor contends that he disclosed the existence of the 2010 Note by representing on his Schedule B that the balance of this Note was applied to the $289,000.00 purchase price of

Unit 320.  [Oct. 1, 2013 Tr. 99:5–100:6 & 100:21–23].  Specifically, the Debtor made the

following disclosure: "$277,543.56 settlement with $240,000 applied to Unit #320 purchase

pursuant to settlement agreement." [Finding of Fact No. 27].  Yet, at the time the Debtor filed

this Schedule (on May 19, 2010), the $240,000.00 had **not** yet been applied to Unit 320's

purchase price.  [*See* Finding of Fact No. 33].  That application did not occur until March 11,

2011, when the Debtor surrendered the 2010 Note with the handwritten phrase, "Pd in full," to

MELP as part of the purchase price for the Debtor to acquire a fee simple interest in Unit 320;

and the amount of the application was not $240,000.00, as represented by the Debtor on

Schedule B, but rather $236,120.00.  [*Id.*].  Thus, by falsely representing that as of May 19,

2010, $240,000.00 had been applied, the Debtor concealed the existence of the 2010 Note as of

that same date, thereby allowing the Debtor to conceal the eventual transfer of the 2010 Note

(and the application of the balance of that Note, which was $236,120.00) on March 11, 2011 to

MELP in order to acquire the warranty deed to Unit 320.

The Debtor also failed to disclose his transfer of the 2010 Note to MELP in his March,

2011 MOR.[32]  [Finding of Fact No. 35].  Rather, on the third page of this MOR, the Debtor

merely wrote, in his own handwriting, that he disbursed $2,387.60 in closing costs for the sale of

---

[32] Courts have attached significant weight to a debtor's failure to truthfully disclose the debtor's financial affairs on
the required MORs, and have denied discharge on these grounds.  *See, e.g.*, *United States Trustee v. Sieber (In re
Sieber)*, 489 B.R. 531, 547, 557 (Bankr. D. Md. 2013) (denying the discharge because the "Debtor's Monthly
Operating Reports were inaccurate and incomplete, making it impossible for the United States Trustee and creditors
to monitor the Debtor's post-petition operations" and the debtor's "lack of credibility and cavalier demeanor in
explaining the discrepancies" in the MORs); *Schmidt v. Cantu (In re Cantu)*, Bankr. No. 08–70260, Adv. No. 09–
7018, 2011 WL 672336, at *32 (Bankr. S.D. Tex. Feb. 17, 2011) (denying discharge because one debtor-spouse
made misstatements on the MORs in both the Chapter 11 business bankruptcy and the individual bankruptcy);
*Comprehensive Accounting Corp. v. Morgan (In re Cycle Accounting Servs.)*, 43 B.R. 264, (Bankr. E.D. Tenn.
1984) ("The cumulative effect of the errors and omissions in [the debtor's] schedules, statement of financial affairs,
and monthly reports amounts to a reckless indifference to the truth, equating to fraud sufficient to deny discharge.").
Attaching significant weight to the truthfulness of the information contained in a MOR is entirely appropriate
because MORs, like Schedules and SOFAs, are signed under penalty of perjury.  Here, the Debtor has submitted not
only inaccurate and incomplete Schedules and SOFAs, but also an inaccurate and incomplete MOR, making it
impossible for any party-in-interest to assess the Debtor's true financial condition and, with respect to the Trustee in
the Pending Chapter 7 Case, making it difficult for him, when scrutinizing the Debtor's exemption of Unit 320 as his
homestead, to determine just exactly how the Debtor acquired Unit 320.

Unit 320; yet, on page 1 of the same MOR, the Debtor misleadingly represented that he disposed of no assets outside the normal course of business, and he expressly omitted his surrender of the 2010 Note to MELP, valued at the time at $236,120.00.  [*Id.*].

In sum, the Debtor, just as he did in the First Chapter 11 Case, made numerous misrepresentations under oath in the Second Chapter 11 Case in order to conceal the transfer on March 11, 2011 of the 2010 Note to MELP that enabled him to acquire the warranty deed to Unit 320.  These false oaths are important with respect to this particular badge of fraud because any creditor or trustee subsequently analyzing how the Debtor acquired Unit 320 as his alleged homestead could be easily confused and blinded by the Debtor's misrepresentations, thereby making it difficult to determine what transactions actually occurred.[33]  The Debtor's misrepresentations and partial disclosures obfuscated not only what interest the Debtor actually held on the date of the filing of the Second Chapter 11 Case (May 19, 2010)—he only had a right to purchase Unit 320 under the Contract for Deed, not a fee simple interest—but also helped to conceal the transfer of the 2010 Note ten months later.  The Debtor's misrepresentations in this regard caused the Trustee to spend significant time ferreting out the truth about the transfer of the 2010 Note when he began scrutinizing the Debtor's homestead exemption claim in the Pending Chapter 7 Case.  With hard detective work, he discovered that the Debtor had acquired Unit 320 by transferring the 2010 Note on March 11, 2011—a conveyance that the Debtor went to great lengths to conceal.

---

[33] When the Trustee was asked whether he could tell by looking at the Schedule A filed in the Second Chapter 11 Case when the Debtor acquired the interest in Unit 320, he responded, "No, you would not know that."  [*See* Sept. 4, 2013 Tr. 38:15–18].  This Court agrees.  Indeed, this Court agrees with counsel for the Trustee's observation that: "The evidence reflects a deliberate pattern of material omissions and outright misrepresentations all designed to hide the ball with respect to the Debtor's true interest in Unit 320."  [Oct. 18, 2013 Tr. 62:16–19].

                *iii.*     *The Debtor's Misrepresentations in the Pending Chapter 7 Case*

Carrying on the tradition of non-disclosure and obfuscation from the First Chapter 11 Case and the Second Chapter 11 Case, the Debtor also lied about his transfer of the 2010 Note to acquire Unit 320 in the Pending Chapter 7 Case. Specifically, item number 10 of the Debtor's SOFA in this Chapter 7 case expressly requires the Debtor to "[l]ist all other property, other than property transferred in the ordinary course of the business or financial affairs of the [D]ebtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case." The facts show that the Debtor did not do so.

The Debtor initiated the Pending Chapter 7 Case by filing his Chapter 7 petition on February 21, 2013. [Finding of Fact No. 37]. Thus, the 2-year look-back period under item number 10 relates back to February 21, 2011. The Debtor acquired Unit 320 on March 11, 2011 by transferring the 2010 Note (on which he handwrote the phrase, "Pd in full") to MELP, and also executing and delivering the $52,880 Note and the Deed of Trust to MELP. [Finding of Fact No. 33]. Thus, within two years of the filing of his Chapter 7 petition, the Debtor transferred the 2010 Note to MELP. Yet, the Debtor did not disclose this transfer in his sworn response to item number 10.[34] [Finding of Fact No. 39]. Thus, in the Pending Chapter 7 Case, the Debtor has concealed his transfer of the 2010 Note.[35]

For all of the reasons set forth above, the Court finds that this third badge of fraud is present. This Court wants to emphasize that even if the Debtor had never filed the First Chapter

---

[34] *See supra* note 31.

[35] It is also significant that the Debtor also failed to disclose another transfer that he made on March 11, 2011. On that date, the Debtor also executed and delivered the Deed of Trust to MELP to secure the $52,880 Note that the Debtor executed and delivered to MELP for the balance of the purchase price of Unit 320. [Finding of Fact No. 33]. Under item number 10 of the Debtor's SOFA, the delivery of the Deed of Trust to MELP is a transfer of property "as security within two years immediately preceding the commencement of this case." There is no question that the Debtor should have disclosed this particular transfer, and his failure to do so is yet another misrepresentation that the Debtor has made in the Pending Chapter 7 Case.

11 Case or the Second Chapter 11 Case, but rather had only initiated just the Pending Chapter 7 Case, his failure to disclose the transfer of the 2010 Note in his SOFA is, in itself, a sufficiently material concealment that the Court would still find that this badge of fraud is present.  By not disclosing that he transferred a significant non-exempt asset (the 2010 Note) to acquire an allegedly exempt homestead (Unit 320), the Debtor impeded the Trustee in fulfilling his fiduciary duty to investigate the Debtor's financial affairs—including whether the Debtor legitimately acquired Unit 320 and may properly claim it as his homestead.

### d.  THE FOURTH BADGE: Before the transfer was made, had the Debtor been sued?

When the Debtor filed the Second Chapter 11 Case on May 19, 2010, he also filed his SOFA [Findings of Fact Nos. 24 & 25]; and his SOFA enumerated fourteen pending lawsuits involving the Debtor.  [Finding of Fact No. 31].  Of these fourteen lawsuits, the Debtor was a defendant in at least eight of them.  [*Id.*].  In the Pending Chapter 7 Case, in both his Original SOFA and Amended SOFA, the Debtor has set forth that he is involved in nine lawsuits. [Finding of Fact No. 41].  The Debtor disclosed that he was a defendant in all nine suits.  [*Id.*]. Of these nine lawsuits, five of them were listed in the SOFA that the Debtor filed in the Second Chapter 11 Case.  [*Id.*].  Thus, by extrapolation, there were at least five lawsuits in which the Debtor was a defendant pending at the time of the March 11, 2011 Transaction.  [*Id.*].  This Court readily finds that the Debtor had been sued multiple times before effectuating the transfer of the 2010 Note on March 11, 2011.  This fourth badge of fraud is therefore present.

### e.  THE FIFTH BADGE: Was the transfer one of substantially all the Debtor's assets?

Some courts have deemed the fifth badge present in instances of an individual debtor when the debtor retains only a small amount of personal belongings and a beneficial interest in a

trust, *L.A. Newgard, Jr. Trust v. United States*, CIV. No. A4–88–022, 1989 WL 90609, at *3 (D.N.D. May 26, 1989), *aff'd sub nom. L.A. Newgard Jr. Trust; by Newgard v. United States*, 909 F.2d 510 (8th Cir. 1990), or where the debtor transferred 95% of her property. *Silagy v. Morris (In re Morris)*, Bankr. No. 11–60657, Adv. No. 12–6133, 2013 WL 5705630, at *17 (Bankr. N.D. Ohio Oct. 18, 2013).

A strict application of *L.A. Newgard* and *Silagy* to the case at bar favors the Debtor. Here, the transfer occurred on March 11, 2011, which was during the tenth month of the Second Chapter 11 Case. [*See* Findings of Fact Nos. 24 & 33]. When the Debtor filed his Schedules in his Second Chapter 11 Case on May 19, 2010, his assets—at least in his view—totaled $37,347,578.83. [Case No. 10-34132, Doc. No. 1, pp. 51 & 17]. Had it been included in the Debtor's total assets on May 19, 2010, the $236,120.00 value of the 2010 Note [*see* Finding of Fact No. 33], would have amounted to only 0.64% of his total assets. [36] Thus, under this analysis, the Debtor's transfer of the 2010 Note was not a substantial portion of his assets. [Doc. No. 152, p. 17, ¶¶ 108 & 109]; unlike the debtors in *L.A. Newgard* and *Silagy*, the Debtor transferred only a miniscule percentage of his assets and retained virtually all of his assets himself (as opposed to putting them in a trust).

However, this Court is not persuaded to decide this badge of fraud by analyzing the March 11, 2011 Transaction through the lens of the Debtor's financial state as he represented it to be in the  original and amended Schedules that he filed  on May 19, 2010 and August 11, 2010 in the Second Chapter 11 Case.[37]   Indeed, the U.S. District Court for the Northern District of

---

[36] The Debtor's total assets would have been $37,583,638.83 if the 2010 Note was included (i.e., $236,120.00 + $37,347,518.83 = $37,583,638.83), and would have amounted to only 0.63% of the total assets (i.e., $236,120.00 ÷ $37,583,638.83 x 100 = 0.63%).

[37] In the Amended Schedules that the Debtor filed on August 11, 2010, he represented that his total assets were $37,343,546.18 [Case No. 10-34132, Doc. No. 50, p. 35], which is not a materially different figure than the asset figure of $37,347,518.83 set forth in the original Schedules [Case No. 10-34132, Doc. No. 1, p. 51].

Georgia has held that to find the presence of this badge, "[t]he relevant inquiry is whether the [Debtor] lost substantially all of [his] assets <u>at the time of the transfer</u>." *Kipperman v. Onex Corp.*, 411 B.R. 805, 856 (N.D. Ga. 2009) (emphasis added).

In the case at bar, the Debtor transferred the 2010 Note on March 11, 2011. [Finding of Fact No. 33]. Hence, the key question is whether, by surrendering the 2010 Note to MELP on March 11, 2011, the Debtor transferred substantially all of his assets?

The Trustee contends that he did. The Trustee starts by emphasizing that the Debtor's transfer of the 2010 Note must viewed from the perspective of the Debtor's creditors. *See In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000). Using this perspective, the Trustee argues that this Court should focus on whether the 2010 Note, if it had not been transferred, would have been the primary asset to administer for the benefit of unsecured creditors in the Pending Chapter 7 Case. The Trustee contends that the 2010 Note would be **the** major asset because it was the Debtor's only material **unencumbered** non-exempt asset when he transferred it to MELP on March 11, 2011. [*Id.* at 52:6–17]. The Trustee also emphasizes that all of the Debtor's other major assets were encumbered; that the Debtor put inflated values on these assets to falsely create both the appearance that these assets had substantial equity and that the value of all of the Debtor's assets was much higher than was actually the case; but that, in fact, none of the assets had any equity, and that eventually all of these, but one, were foreclosed upon. [*See id.* at 52:12–53:8]. Under these circumstances, the Trustee contends that the Debtor's surrender of the 2010 Note did indeed constitute a transfer of substantially all of his assets because the Debtor now claims that the asset that he acquired in return (i.e., Unit 320) is exempt—leaving unsecured creditors with no material assets as a source of repayment. As the Trustee's counsel so aptly stated: "From the

perspective of the unsecured creditors in this case, the [2010 Note] would have been the only game in town." [*Id.* at 52:23–53:2].

The Debtor contends that the Trustee's argument is flawed because on March 11, 2011, the Debtor's state of mind was such that he truly believed his assets had substantial value—and the Trustee has not proven otherwise. The Court agrees that the Trustee has not proven otherwise; however, he does not need to do so. The focus should be not on what the Debtor truly believed was the total value of his assets when he filed his Schedules and Amended Schedules on May 19, 2010 and August 11, 2010, but rather on what was actually occurring in the Debtor's financial life when he transferred the 2010 Note on March 11, 2011.

A review of the docket sheet of the Second Chapter 11 Case is telling. It reflects that several motions to lift stay were filed between the date of the filing of the Second Chapter 11 Case and March 11, 2011. [*See* Case No. 10-34132, Doc. Nos. 5, 13, 35, 40, 103 & 111]. The docket sheet also reflects that during this same time period, this Court entered several orders lifting the stay relating to real property which the Debtor owned in both Texas and New Mexico. [*See id.* at Doc. Nos. 16, 49, 62 & 116]. Indeed, the Debtor testified that on or about the date that this Court had a status conference in the Second Chapter 11 Case (which was June 9, 2010), "Judge Bohm had signed an Order allowing for the foreclosure by Texas Community Bank on five of the units that I owned." [Oct. 1, 2013 Tr. 129:23–25]. The docket sheet also reflects that on November 10, 2010, three separate adversary proceedings were filed against the Debtor seeking to prevent his discharge under § 523(a) for fraud. [Case No. 10-34132, at Doc. Nos. 79, 80 & 81]. Thus, by March 11, 2011, the Debtor's "real estate kingdom"—to use the description of the Debtor's present counsel [Oct. 18, 2013 Tr. 39:24–25]—was swiftly crumbling, and the Debtor was also finding himself a defendant in three nondischargeability actions. Given these

circumstances, the Court finds that the Debtor's financial condition on March 11, 2011 was woeful, and that he either had no equity in any of the properties that he still owned or, if he really did have equity, he was about to lose it; indeed, as counsel for the Trustee noted, these properties were being foreclosed upon, or about to be foreclosed upon [Oct. 18, 2013 Tr. 52:18–22].

Under these circumstances, the Court finds the Trustee's argument persuasive that the Debtor's transfer of the 2010 Note was indeed the only material, unencumbered asset that the Debtor had when he surrendered it on March 11, 2011. Therefore, the Court concludes that the transfer of the 2010 Note constituted a transfer of substantially all of the Debtor's assets.

For these reasons, the Court finds that this fifth badge of fraud is present.

### f.   THE SIXTH BADGE: Has the Debtor absconded?

Black's Law Dictionary defines "abscond" as "to depart secretly or suddenly, [especially] to avoid arrest, prosecution, or service of process." BLACK'S LAW DICTIONARY 7 (8th ed. 2004). In a previous case, this Court found abscondence when a president and business manager "did not come to the door when the process server attempted to serve her." *West v. Seiffert (In re Houston Drywall, Inc.)*, Case No. 05–95161–H4–7, Adv. No. 06–03415, 2008 WL 2754526, at *23 (Bankr. S.D. Tex. July 10, 2008). Another court found abscondence in the context of the badges of fraud when the defendants transferred $6.7 million to an alleged investor who afterward fled his home in Canada, despite an order of arrest from a Canadian court. *Nisselson v. Empyrean Inv. Fund, LP (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 400 (Bankr. S.D.N.Y. 2007); s*ee also Block v. Moss (In re Moss)*, 258 B.R. 405, 426 (Bankr. W.D. Mo. 2001) (finding a protracted course of abscondence when the debtor fled from California, and subsequently from Nevada and Arizona, after receiving the proceeds of a personal injury settlement).

In the case at bar, the Trustee has presented no evidence to indicate that the Debtor has absconded.  Indeed, the Debtor has not only not fled out of the state or out of the country, but he has also remained in Houston, residing in Unit 320.  Given these circumstances, this sixth badge of fraud is not present.

### g.   THE SEVENTH BADGE: Has the Debtor concealed the asset?

Typically, when courts focus on a debtor's concealment of a specific asset, they are dealing with tangible personal property such as a boat or artwork.  In the case at bar, the asset at issue—the 2010 Note—is not tangible personal property, but rather, intangible personal property. *In re Guardianship of Fleckenstein,* 589 S.W.2d 788, 789–90 (Tex. Civ. App.—El Paso 1979, no writ) ("The promissory note is intangible property in the nature of a 'chose in action' which can only be claimed or enforced by an action in court and not by taking physical possession like other types of property.").  When dealing with this type of property, it is appropriate to focus not on whether the Debtor physically hid it in, for example, a storage unit[38], but rather, whether he concealed its existence in his Schedules, SOFA and MOR.  Here, the Debtor went to great lengths to cover up the existence of the 2010 Note in his filings with this Court.

The Debtor received the 2010 Note from MELP on May 18, 2010 just prior to filing the Second Chapter 11 Case, but failed to disclose this asset on his Schedule B in the Second Chapter 11 Case; and he never amended this Schedule to make such disclosure.  [Findings of Fact Nos. 21, 27 & 32].  He also concealed his ownership of the 2010 Note by representing on

---

[38] *See Schmidt v. Cantu (In re Cantu)*, Bankr. No. 08–70260, Adv. No. 09–7018, 2011 WL 672336, at *11–12 (Bankr. S.D. Tex. Feb. 17, 2011) (holding that the debtor's improper concealment of two bronze sculptures by physically hiding them in a storage unit before transferring possession to his sister and failure to list the valuable sculptures on a gift tax return and on his Schedules gave rise to a presumption of fraudulent intent); *see also Depaola v. Dorsey (In re Dorsey)*, Bankr. No. 09–11157–WRS, Adv. No. 10–1006–WRS, 2011 WL 2313158, at *13–14 (Bankr. M.D. Ala. June 8, 2011) (holding that although the debtor disclosed his ownership of a boat, he failed to disclose the location of the boat on his Schedule B and concealed the location of the boat during the pendency of the bankruptcy case), *aff'd sub nom. Dorsey v. DePaola,*  No. 2:11–CV–1026–MEF, 2012 WL 1957713 (M.D. Ala. May 31, 2012).

Schedule B that $240,000.00 of a settlement totaling $277,543.56 had been applied to the purchase price of Unit 320. [Finding of Fact No. 27]. This disclosure was patently false. On the date of the filing of the Second Chapter 11 Case (which was May 19, 2010), the Debtor was the owner and holder of the 2010 Note [Findings of Fact Nos. 21 & 24], as he had not yet delivered the 2010 Note marked "Pd in full" to MELP as partial payment for obtaining the warranty deed to Unit 320 from MELP [Finding of Fact No. 33]. That delivery was not actually made until a full ten months later when the Debtor—on March 11, 2011—actually surrendered the 2010 Note as part of the purchase price that he paid to MELP to acquire the warranty deed for Unit 320.[39] [*Id.*].

Importantly, the Settlement Statement evidencing the Debtor's acquisition of Unit 320 does in fact reference the 2010 Note. [Trustee's Ex. No. 11, p. 1]. However, the Debtor did **not** disclose the Settlement Statement in the Second Chapter 11 Case, thereby concealing the 2010 Note. [*See* Finding of Fact No. 35]. He should have attached the Settlement Statement to his MOR for March, 2011. If he had done so, his creditors would have discovered the existence of the 2010 Note and understood—and perhaps objected to—the transaction involving the Debtor's

---

[39] It is worth noting that when the Debtor surrendered the 2010 Note to MELP, the amount owed under this Note was $236,120.00, and it was this amount that the Debtor cancelled and which was applied to the purchase price of $289,000.00 that the Debtor had to pay to MELP to acquire the warranty deed to Unit 320. [*See* Finding of Fact No. 33]. Yet, on his Schedule B, the Debtor represented that $240,000.00 of a settlement totaling $277,543.56 had been applied. [Finding of Fact No. 27]. Thus, the Debtor, when he filed Schedule B on May 19, 2010, was not only failing to disclose that he owned the 2010 Note at that time, [*Id.*]; he was also misrepresenting the amount of the purchase price against which the Note's balance could be applied: it was $289,000.00, not $277,543.56 [Finding of Fact No. 33]. There is no question that the Debtor, on May 19, 2010, knew that the purchase price was $289,000.00, and not $277,543.56, as the CSA and the Contract for Deed (which the Debtor had signed the previous day) expressly set forth that the purchase price was $289,000.00. [*See* Findings of Fact Nos. 20 & 21]. This misrepresentation was yet another obfuscation by the Debtor to prevent anyone from suspecting that he owned the 2010 Note and would be using it to pay a substantial portion of the purchase price for him to acquire the warranty deed to Unit 320.

acquisition of Unit 320. [40]   Instead, the Debtor, in somewhat poor handwriting on page 3 of the

MOR, made a passing reference to Unit 320:

> Closing Costs on Unit #320                    2,387.60
> Execution of contract for deed
> Unit closed 3/11/11

[Finding of Fact No. 35].  There was no handwritten mention, however, of his delivery of the

2010 Note to MELP; nor is there any reference whatsoever on any page of the MOR to the

existence of the 2010 Note.  [*Id.*].

The Debtor also misrepresented in his MOR the amount of total disbursements during the

month of March, 2011.  [Case No. 10-34132, Doc. No. 155, p. 1].  In the attachment to the

MOR, the Debtor represented, in his own handwriting, that the amount of "Other receipts" for

Line 5 was "Ø" and that the amount of "Other Disbursements" for Line 17 was $3,181.50.  [Case

No. 10-34132, Doc. No. 155, p. 3].   Among these disbursements, the Debtor selectively

disclosed on the MOR the amount of closing costs for Unit 320 (i.e., $2,387.60), but he omitted

his forgiving the indebtedness owed by MELP under the 2010 Note and his surrendering its

$236,120.00 value.  [*Id.*].  The Debtor also affirmatively misrepresented that none of his assets

were disposed of outside the normal course of business [Finding of Fact No. 35], when, in fact,

he had transferred the 2010 Note marked "Pd in full" to MELP [Finding of Fact No. 33].[41]

The Debtor continued his concealment of the 2010 Note in the Pending Chapter 7 Case.

[*See* Finding of Fact No. 39].   Item 10 of the SOFA requires the Debtor to "[l]ist all other

property, other than property transferred in the ordinary course of the business or financial affairs

---

[40] If the Debtor had attached the Settlement Statement, creditors would have been alerted to the existence of the 2010 Note, which would have allowed them to gain a clear picture of how the Debtor was disposing of this non-exempt asset in order to acquire an exempt asset.  This is so because the Settlement Statement references the "Payoff of Cowin Note $236,120.00" and "Seller-Financing $52,880.00."  [*See* Trustee's Ex. No. 7, p. 1].

[41] *See supra* note 31.

of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case." The Debtor disclosed two transfers here, but he did **not** disclose his transfer of the 2010 Note to MELP, which he made in order to acquire the warranty deed for Unit 320.[42] [*See* Findings of Fact Nos. 39 & 40].

"Any debtor who files a bankruptcy petition must disclose his assets and any transfers thereof. This information, detailed in the SOFA, is vital to the administration of the Debtors' bankruptcy estate." *In re Henley*, 480 B.R. 708, 767 (Bankr. S.D. Tex. 2012)). The SOFA requires that an individual debtor declare under penalty of perjury that the information contained in the SOFA is true and correct.[43] By signing this declaration in his SOFA on March 1, 2013, the Debtor perjured himself. [*See* Finding of Fact No. 38]. He concealed the very existence of the 2010 Note from the Trustee, thereby hampering the Trustee's ability to fulfill his fiduciary duty to administer the estate in the Pending Chapter 7 Case.

Under all of the circumstances described above, this Court concludes that the seventh badge of fraud exists.

### h. THE EIGHTH BADGE: Was the value of the consideration received by the Debtor reasonably equivalent to the value of the asset transferred?

The Supreme Court has defined "reasonably equivalent" to mean that "the debtor has received value that is substantially comparable to the worth of the transferred property." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 548 (1994). Moreover, "value is determined as of the date of the transfer." *Boudloche v. Hinsley (In re Hinsley)*, 201 F.3d 638, 644 (5th Cir. 2000). Importantly, the Fifth Circuit has held that "[t]he value of consideration given for a transfer alleged to be in fraud of creditors is determined from the standpoint of creditors." *Id.* It follows

---

[42] *See id.*

[43] "I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct." [Case No. 13-30984, Doc. No. 13, p. 53].

that "[t]he proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors." *Stanley v. U.S. Bank Nat'l Ass'n (In re TransTexas Gas Corp.)*, 597 F.3d 298, 306 (5th Cir. 2010) (quoting *In re Hinsley*, 201 F.3d at 644). Thus, this badge is present when the facts indicate that the estate has not received value reasonably equivalent to the non-exempt asset transferred by the debtor.

Here, at the time of the Debtor's disposition of the 2010 Note, on March 11, 2011, the Debtor and MELP had already agreed to a purchase price of $289,000.00 for Unit 320. [*See* Findings of Fact Nos. 20, 21, 22 & 33]. The balance which MELP owed under the 2010 Note satisfied $236,120.00 of that amount, or 81.7% of the purchase price.[44] [Finding of Fact No. 33]. The Debtor's transfer of the 2010 Note to MELP marked "Pd in full" therefore siphoned nearly a quarter of a million dollars of value available to his creditors. [*Id.*]. Moreover, the transfer of the 2010 Note procured no assets or economic benefits for the estate, and instead procured a dubious homestead solely for the Debtor's personal benefit.

In his closing argument, counsel for the Debtor argued that the Debtor's uncontroverted testimony was that the 2010 Note had virtually no value, and that therefore the Debtor's surrender of the 2010 Note marked "Pd in full" to MELP did not really deprive the estate of any material asset. [Dec. 3, 2013 Tr. 93:7–95:11]. However, counsel for the Trustee pointed out that the promissory note which the Debtor testified had virtually no value was the 2008 Note, **not the 2010 Note.** [Oct. 18, 2013 Tr. 9:4–10; Dec. 3, 2013 Tr. 95:12–16]. A review of the transcript regarding the Debtor's testimony reflects that counsel for the Trustee is correct: the Debtor's testimony is about the value of the 2008 Note. [Dec. 3, 2013 Tr. 17:9–18:9, 24:10–25:6, 32:10–13, 40:15–16 & 62:22–63:17]. Thus, the argument made by counsel for the Debtor is simply incorrect: the Debtor never testified that the 2010 Note had virtually no value.

---

[44] *See supra* note 25.

Counsel for the Debtor nevertheless contends that the Trustee never introduced any evidence about the value of the 2010 Note and that because it is the Trustee's burden to do so on this point, he has failed to meet his burden. [Dec. 3, 2013 Tr. 93:23–94:4, 95:4–11 & 95:21–96:15]. Counsel for the Trustee argues that the evidence of the value of the 2010 Note is proven by the very fact that MELP accepted this note from the Debtor, and gave him a credit of $236,120.00 towards the purchase price of Unit 320. [*Id.* at 99:15–23]. This Court agrees. Indeed, the Settlement Statement evidencing the fee simple conveyance of Unit 320 by MELP to the Debtor unambiguously sets forth that $236,120.00 of the total purchase price of $289,000.00 is paid by the surrender of the 2010 Note. [Finding of Fact No. 33; *see also* Findings of Fact Nos. 20 & 21 (the CSA and Contract for Deed also expressly make this statement)]. It is just as if the Debtor paid cash of $236,120.00 to MELP. Accordingly, this Court finds that the Trustee has proven that the value of the 2010 Note was $236,120.00, and that by surrendering this Note to MELP in order to acquire Unit 320, the Debtor deprived the estate of a non-exempt asset with a value of $236,120.00.

This Court also notes that the value of the 2010 Note can be assessed through focusing on whether MELP was making its payments to the Debtor under this instrument before the Debtor surrendered it to MELP on March 11, 2011. In fact, MELP was making payments under the 2010 Note. On May 18, 2010, when MELP executed and delivered the 2010 Note to the Debtor, the principal amount owed was $276,500.48 [Finding of Fact No. 21]. Approximately ten months later—on March 11, 2011, when the Debtor surrendered the 2010 Note to MELP as part of the purchase price of Unit 320—the balance owed under the 2010 Note was $236,120.00 [Finding of Fact No. 33]. Thus, MELP has made payments during this ten-month period of

approximately $40,380.00.  These facts underscore that the 2010 Note did indeed have value—in this case a value of $236,120.00.

In sum, this Court assesses the value that the Debtor's estate received in light of the purpose "to protect the creditors." *S.E.C. v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007).  Under the circumstances set forth above, this Court concludes that the eighth badge of fraud is present in this case; the Debtor's creditors received absolutely nothing as a result of the Debtor's transfer of the 2010 Note and were deprived of a non-exempt asset with a value of $236,120.00.

### i.   THE NINTH BADGE: Was the Debtor insolvent, or did he become insolvent, shortly after the transfer?

The Trustee argues that in order to determine whether the Debtor was insolvent at the time he transferred the 2010 Note, or became insolvent shortly afterwards, this Court must apply TUFTA's definition of insolvency.  [Oct. 18, 2013 Tr. 64:1–9].  This Court agrees. *Askanses v. Fatjo*, 130 F.3d 657, 674 (5th Cir. 1997); *Camieri v. Jobs.com Inc.*, 393 F.3d 508,529 (5th Cir. 2004) ("The ruling of the bankruptcy court, therefore, is affirmed because it properly decided to use Texas law, not the Code, to define ' legally available funds' under the TBCA's definition of insolvency.").

With respect to a debtor's insolvency, TUFTA provides the following:

(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

(b) A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent.

TEX. BUS. & COM. CODE ANN. § 24.003(a), (b) (2013).

The Debtor transferred the 2010 Note on March 11, 2011.  [Finding of Fact No. 33].  The cleanest approach to determining whether the Debtor was insolvent on March 11, 2011 is to

review an accurate balance sheet of the Debtor's financial condition on that date.  Unfortunately, there is no such balance sheet in the record.  The inquiry does not, however, end here.  Courts have found that a debtor's insolvency at a particular time may be established through the process of retrojection by "showing that the debtor was insolvent a reasonable time after the transfer and that the debtor's financial condition did not materially change during the intervening period." *Weaver v. Kellogg*, 216 B.R. 563, 576 (S.D.Tex. 1997); *In re Pace*, 456 B.R. 253, 273 (Bankr. W.D. Tex 2011).  Other courts have used a retrojection process by reviewing evidence of the debtor's financial condition at a certain date prior to the transfer and at a certain date after the transfer.   *See e.g., In re Sullivan*, 161 B.R. 776, 784 (Bankr. N.D. Tex. 1993) (accepting evidence six months before and six months after the transaction in question in order to show insolvency at the time of the transaction).  Use of this method accords with the Fifth Circuit's statement that "[w]e have not imposed strict time limits regarding badges of fraud, however, instructing courts to look instead to the 'general chronology' of the debtor's transactions." *Cipolla v. Roberts (In re Cipolla)*, 476 F. App'x. 301, 309 (5th Cir. 2012)

Application of this retrojection process to the case at bar leads this Court to find that the Debtor was insolvent on or about March 11, 2011 (i.e., the date of the transfer of the 2010 Note). First,  the Debtor himself testified that on May 19, 2010—i.e., the date of the filing of the Second Chapter 11 case—he did not have the ability to pay his debts as they came due. [Oct. 1, 2013 Tr. 79:20–80:7].  Thus, on this date, under TUFTA, the Debtor is presumed to be insolvent, and it is his burden to overcome this presumption.  The Debtor contends that the Schedules that he filed on May 19, 2010 reflect that his assets greatly exceeded his liabilities and that therefore he has rebutted the presumption of insolvency.[45]  This Court disagrees.  As noted in the section on

---

[45] The Debtor initially scheduled his assets to have an aggregate value of $37,347,518.83 and his liabilities to be $12,543,476.95.  [Case 10-34132, Doc. No. 1, p. 51].  In August of 2010, the Debtor filed amended Schedules

credibility, this Court has found that the Debtor is not a credible person.  The Court finds that the asset values which the Debtor set forth in his Schedules in the Second Chapter 11 Case are wildly overstated.  Indeed, the Debtor testified that when he filed the Second Chapter 11 Case on May 19, 2010, he had defaulted on a number of financial obligations and was facing multiple foreclosures on the properties listed on his Schedules.  [Oct. 1, 2013 Tr. 80:2-3].  This is some of the most accurate testimony given by the Debtor and underscores that the values he attached to the assets were vastly inflated.  In fact, the Debtor's SOFA for the Pending Chapter 7 Case indicates that only one of the Debtor's properties was not foreclosed upon by early 2012.  [*See* Case No. 13-30984, Doc. No. 3 & 47].  Under these circumstances, this Court finds that the Debtor has failed to rebut the presumption that he was insolvent on the date that the Second Chapter 11 case was filed.  Thus, the first prong of the retrojection analysis is complete: ten months prior to the transfer of the 2010 Note, the Debtor was insolvent.

The second prong of the retrojection analysis focuses on whether the Debtor was insolvent "a reasonable time" after the transfer of the 2010 Note.  In this case, a reasonable point in time on which to focus is February 21, 2013, the date of the filing of the Pending Chapter 7 Case.  [Finding of Fact No. 37].  The Schedules filed in this case reflect that the Debtor's total liabilities are $7,936,685.32 and that his total assets $2,138,021.27 [Case No. 13-30984, Doc. No. 13, p. 1]; therefore, the Court finds that on this date, the Debtor was insolvent under TUFTA's definition of "insolvency".  Having thus found that the Debtor was insolvent on May 19, 2010 and also on February 21, 2013, the Court finds that the Debtor was insolvent on March 11, 2011.  The 11th day of March, 2011 is the date on which the Debtor transferred the 2010

---

representing that his total assets were $37,343,546.18, a figure which is not materially different from the original total asset figure of $37,347,518.83.

Note to MELP and a date which occurred several months after May 19, 2010 and several months before February 21, 2013—thereby conforming with the retrojection analysis.

For all of these reasons, the Court finds that the ninth badge is present at the case at bar.

> **j.      THE TENTH BADGE: Did the transfer occur shortly before or after a substantial debt was incurred?**

The transfer that is the subject of this analysis is the Debtor's delivery of the 2010 Note marked "Pd in full" to MELP.  [*See* Finding of Fact No. 33].  Thus, with respect to this tenth badge, this Court must determine two issues: (1) whether the Debtor incurred a debt shortly before or shortly after the Debtor surrendered the 2010 Note to MELP; and (2) whether this debt was substantial.

The Debtor paid the purchase price of $289,000.00 for Unit 320 by surrendering the 2010 Note and then immediately thereafter executing and delivering to MELP the $52,880 Note and the Deed of Trust.  [Finding of Fact No. 33].  Thus, there is no question that the Debtor incurred a debt shortly after the Debtor surrendered the 2010 Note marked "Pd in full" to MELP.  The first prong is therefore satisfied.

Does the Debtor's execution and delivery of the $52,880 Note to MELP constitute a substantial debt incurred by the Debtor?  This Court concludes that it does for two separate and independent reasons.  First, the amount of $52,880.00 itself is substantial.  Indeed, this Court has previously found that, viewed in isolation, a debt as large as $52,880.00 is "substantial" for the purposes of this tenth badge.  *See In re Houston Drywall, Inc.*, Case No. 05–95161–H4–7, Adv. No. 06–03415, 2008 WL 2754526, at *23 (Bankr. S.D. Tex. July 10, 2008) (finding a debt of $53,869.95 "substantial"); *In re Sissom*, 366 B.R. 677, 698 (Bankr. S.D. Tex. 2007) (finding that a "$50,000.00 debt qualifies as substantial.").

Second, the Trustee correctly points out that the Debtor incurred this debt on March 11, 2011 while he was a debtor-in-possession in the Second Chapter 11 Case; and he did so without ever obtaining this Court's approval.  [Findings of Fact Nos. 33 & 34].  Section 364 requires any debtor-in-possession to obtain court approval for post-petition financing unless obtaining such financing is in the ordinary course of the debtor-in-possession's business.  *See* 11 U.S.C. §§ 364(b) and 1107(a); *see, e.g.*, *In re Korn*, 352 B.R. 228, 247 (Bankr. D. Idaho 2006), *aff'd sub nom. DDR Nampa, LLC v. Korn (In re Korn)*, Bankr. No. 04–4261–TLM, No. CV 06–467–S–EJL, 2007 WL 1381807 (D. Idaho Apr. 24, 2007) ("Section 364(b) requires notice, hearing, <u>and court approval</u> before a debtor in possession may obtain unsecured credit <u>outside the ordinary course of business</u> that, in turn will be given an administrative expense priority.") (emphasis added).  Here, the Debtor's execution of the $52,880 Note was not in the ordinary course of his real estate business, and there is no question that he needed to obtain this Court's approval.[46] Because the $52,880 Note is an unauthorized debt, the Debtor's incurrence of this debt is necessarily an act of material importance; no violation of the Code in this respect is insubstantial. It follows therefore that if the violation is material, the debt associated therewith is substantial. To conclude otherwise would essentially be endorsing the Debtor's violation of the Code.

In sum, for the reasons set forth above, the Court concludes that this tenth badge of fraud is present.

---

[46] The Debtor executed the $52,880 Note in order to acquire the warranty deed to Unit 320.  He needed this Court's approval under §364 to incur this debt, and he did not obtain it.  The Debtor contends that he did not need this Court's approval because he incurred this debt "in the ordinary course of his real estate business."  This Court disagrees. To establish that incurring the debt of $52,880 was in the ordinary course of his business, the Debtor needs to prove that his creditors would expect him, as part of his real estate business, to execute a promissory note with a balloon payment in eighteen months (which are the repayment terms of the 2010 Note) for the purpose of obtaining an exempt homestead.  The Debtor offered no such proof.  *See e.g.*, *Rajala v. Langer (In re Lodge Am., Inc.)*, 259 B.R. 728, 733 (D. Kan. 2001) (holding that the debtor's obtaining short-term post-petition financing was outside the ordinary course of business because the debtor presented no evidence that the debtor ever made a short-term financing arrangement apart from this instance).

**k.**      **THE ELEVENTH BADGE: Was the transfer completed immediately before the Debtor filed his bankruptcy petition?**

This badge of fraud derives from *In re Lacounte*, 342 B.R. 809, 816 (Bankr. D. Mont. 2005), in which the debtors had sold non-exempt assets and applied the proceeds to a home mortgage three months before filing their bankruptcy petition.  *Id.* at 812.  In previous cases, this Court has found this eleventh badge present where a debtor completed the improper transfer fewer than ninety days before filing a bankruptcy petition.  *See In re Presto*, 376 B.R. 554, 571 (Bankr. S.D. Tex. 2007); *In re Sissom*, 366 B.R. 677, 698 (Bankr. S.D. Tex. 2007).

In the case at bar, the Debtor filed his Chapter 7 petition on February 21, 2013 [Finding of Fact No. 37]; whereas, the Debtor transferred the 2010 Note on March 11, 2011.  [Finding of Fact No. 33].  Thus, the transfer occurred approximately twenty-three months before the Debtor filed the Chapter 7 petition initiating the Pending Chapter 7 Case.  Given this time elapse, the Court finds that the transfer was not completed immediately before the Debtor initiated the Pending Chapter 7 Case.  Accordingly, the Court finds that this eleventh badge is not present.[47]

**l.**      **THE TWELFTH BADGE: Is the Debtor unable to explain the disappearance of assets?**

As discussed under the third and seventh badges of fraud, the Debtor has engaged in a prolonged concealment of the very existence of the 2010 Note and the transfer of this Note to MELP as part of the consideration for MELP's delivery to him of the warranty deed to Unit 320.  The 2010 Note departed the Debtor's estate on March 11, 2011, when the Debtor transferred it marked "Pd in full" to MELP.  [Finding of Fact No. 33].  More precisely, when the Debtor marked the 2010 Note "Pd in full" and forgave its $236,120.00 balance, this amount effectively

---

[47] The Court wants to emphasize that merely because this eleventh badge is absent does not detract from the gravity of the Debtor's failure to honestly disclose in his answer to item number 10 on his SOFA that he transferred the 2010 Note within two years of the filing of his Chapter 7 petition.  Item 10 expressly imposes this two-year "lookback period;" whereas, this eleventh badge of fraud focuses solely on whether the transfer was completely <u>immediately</u> before the Debtor filed his Chapter 7 petition.

disappeared from the Debtor's estate.  As discussed below, the Debtor has failed to explain the disappearance of this asset.

The Debtor attempts to explain the undisclosed disappearance of the 2010 Note by pointing the finger at the attorney who represented him in the Second Chapter 11 Case.  The Debtor contends that he himself was not knowledgeable about bankruptcy law in general and his duty of complete disclosure in particular, and that he relied completely on his attorney with respect to what to disclose in the Second Chapter 11 Case.[48]  [*See* Dec. 3, 2013 Tr. 68:14–19 & 75:24–76:14].  The Court rejects this argument.

The Debtor's position is eerily similar to the debtor's position in *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197 (5th Cir. 1999).

> At the July 1993 bankruptcy hearing, when asked why he did not disclose those claims on Coastal's schedules, [the Debtor's CEO] responded that "[w]e pretty much relied on our attorneys. We had no experience in filling those out, and we provided them the information, and maybe later on during the process, . . . a couple of months down the road we may have filled them out ourselves . . . . We went to [a] library and tried to find books on how to fill these forms out . . . ." He testified further: "[W]e had never done these kind of statements before, and we depended upon our legal counsel . . . about these types of things, and he had kind of a check list for us . . . .[W]e depended upon [him] to give us the guidance on what to put . . . ."

*Id.* at 212.  The Fifth Circuit gave short shrift to the Debtor's position:

> *Duke's claimed lack of awareness of Coastal's statutory disclosure duty for its claims against Browning is not relevant.  See Chandler v. Samford University, 35*

---

[48] The Debtor testified: "I didn't draft [any of] the Schedules [that have been submitted to the courts].  I didn't write the Schedules." [Dec. 3, 2013 Tr. 68:16–17].  When his present attorney of record asked him who drafted the Schedules, the Debtor replied, "The people at the Fuqua Law Office."  [*Id.* at 68:18–19].  In closing arguments, the Debtor's attorney argued that Fuqua's mistakes in drafting the Debtor's Schedules should not be used to infer that the Debtor had fraudulent intent: "The facts – the uncontroverted facts are: That [the Debtor] provided Mr. Fuqua and his staff with all details; That Mr. Fuqua's office was actually counsel involved with the transactions; That Mr. Fuqua's office drafted the Schedules and Mr. Fuqua even stood before you, Your Honor . . . and he said, 'Gee, Judge we're sorry if there's some problems with these Schedules, but I had problems in my office and had to replace an employee.' . . . So do we attribute the way that Richard Fuqua decided to list those transactions in the Schedules, even if wrong, to some bad intent on my client's part?  I suggest, Your Honor, that the law counsels otherwise.  I suggest that the law counsels that the Debtor is entitled to his homestead exemption unless it is proven that he had the intent to defraud, hinder, or delay."  [*Id.* at 77:15–25 & 78:13–19].

F.Supp.2d 861, 865 (N.D. Ala.1999) ("Research reveals no case in which a court accepted such an excuse for a party's failure to comply with the requirement of full disclosure").  In any event, no one testified that Coastal's bankruptcy attorney advised Coastal *not* to disclose the claims.

*Id.* (emphasis added).

Thus, even if this Court believed the Debtor's testimony that he did not understand exactly what he needed to disclose—and this Court does **not** believe the Debtor—it would not matter.  The Fifth Circuit has expressly held that a debtor's claimed lack of knowledge and experience **is irrelevant**.  What is relevant is that a debtor, upon the filing of a bankruptcy petition, automatically incurs a duty to completely and accurately disclose all assets, liabilities, and transactions.  *Id.* at 207–08 ("It goes without saying that the Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets . . . ."); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 416–17 (3d Cir. 1988) (holding that a debtor has an affirmative duty under § 521 to fully disclose all assets and interests in property and also to amend the schedules whenever it becomes necessary to ensure the accuracy and reliability of the information disclosed therein).  Here, the Debtor had a duty to disclose the extinguishment (or disappearance) of the 2010 Note in the Second Chapter 11 Case, but he failed to do so.  [*See* Findings of Fact Nos. 27 & 32].  That he relied upon the bankruptcy attorney representing him is no defense.

Further, even if the Fifth Circuit's holding in *Coastal Plains* somehow does not apply in the case at bar—and this Court firmly believes that it does—the words of the bankruptcy court in *Daniels v. Agin*, 482 B.R. 1 (D. Mass. 2012), *aff'd*, 736 F.3d 70 (1st Cir. 2013) are spot on with respect to the Debtor here:

[I]t is well settled that reliance upon advice of counsel is, in this context, no defense where it should have been evident to the debtor that the assets ought to be listed in the schedules."  *In re Tully*, 818 F.2d at 111. "A debtor cannot, merely by

> playing ostrich and burying his head deeply enough in the sand, disclaim all
> responsibility for statements which he has made under oath." *Id.* Such is
> certainly the case here, where [the debtor], a sophisticated businessman, belatedly
> laid blame on his counsel after he had multiple opportunities himself during the
> bankruptcy proceeding to disclose the [assets] and did not.

*Id.* at 13 (emphasis added); *see also Banc One, Tex., N.A. v. Braymer (In re Braymer)*, 126 B.R. 499, 503 (Bankr. N.D. Tex. 1991) ("The Debtor changed attorneys and sought to explain her assertions by testifying that she simply followed the advice of her attorneys.  The Debtor is a sophisticated businesswoman.  She was a director of Robertson Oil Company for a number of years and served on the board of directors of a major bank.  She and her family have been engaged in the oil and gas business for years.  The court cannot find her explanation to be credible.") (emphasis added).

  In the case at bar, this Court notes that the Debtor is a **very sophisticated individual**. He holds an M.B.A. from the University of Chicago; he worked at Exxon for over 29 years, until his retirement several years ago; while employed at Exxon, he engaged in making tax transfer loans in his own name, and he continued doing so after retirement from Exxon[49]; he is a licensed real estate broker who has been involved—to use his own words—in "many many years of real estate transactions;" he has been in the real estate development business for the last several years; and he has formed ten business entities over this period in order to conduct his real estate business.  [Findings of Fact Nos. 1–7].

---

[49] This particular finding of fact comes from Finding of Fact No. 3 that this Court made in the adversary proceedings which this Court tried in the Second Chapter 11 Case, which resulted in this Court issuing a Judgment of Nondischargeability as to certain debts owed by the Debtor to certain financial institutions.  This Court is entitled to use this finding of fact from those adversary proceedings in the dispute at bar.  *See, e.g., Riverport Ins. Co. v. Oakland Community Housing, Inc.*, 668 F. Supp. 2d 1235, 1237 (N.D. Cal. 2009) ("While the court is not bound by its previous decision, the court nevertheless adopts its previous reasoning."); *In re Jacobsen*, No. 07–41092, 2009 WL 3245418, at *1 (Bankr. E.D. Tex. Sept. 30, 2009) ("The Court, having  considered the record of this case and evidence presented at the show cause hearing as well as prior related hearings, makes the following findings of fact and conclusions of law."); *Cleveland v. Union Parish School Bd.*, Civ. Action No. 12,924, 2009 WL 1491188, at *2 (W.D. La. Aug. 12, 2009) (adopting by reference portions of the court's previous ruling); *Hoffman v. Greene (In re Burke)*, 374 B.R. 781, 783–84 (Bankr. D. Colo. 2007) (adopting and incorporating the court's previous findings of fact, conclusions of law, and the decisions and opinions that were relevant to this ruling), *aff'd*, Bankr. No. 98–25466–MER, Civ. Action No. 07–cv–01947–AP, 2008 WL 4452133 (D. Colo. Sept. 29, 2008).

Case law indicates that the more sophisticated a debtor is, the lower the bar should be for establishing reckless indifference to the truth.  *See, e.g., McDonough v. Sigust (In re Sigust)*, 255 B.R. 822, 828–29 (Bankr. W.D. La. 2000) ("This Court can only conclude that the debtors have been recklessly indifferent to the truth.  There is no justification for the extensive omissions in the debtors' Schedules.  Nor do we find any justification for debtors' failure to maintain financial records.  Both debtors are well educated.  Mr. Sigust's career is a particularly distinguished one.  Despite having an M.B.A. degree, and working in national security and highly technical fields, he does not keep even the most rudimentary records other than copies of tax returns."), *aff'd*, 281 F.3d 1280 (5th Cir. 2001); *In re Braymer*, 126 B.R. at 503.  These cases underscore that a high degree of sophistication works against a debtor's assertion that he was unaware of his duties as a debtor-in-possession to make complete disclosure to his creditors.

In the case at bar, the Debtor's very high degree of sophistication leads this Court to find that he was recklessly indifferent to the truth when he failed to disclose the extinguishment (i.e., disappearance) of the 2010 Note in the Second Chapter 11 Case.  And, because of this finding, the Debtor's attempt to blame his former bankruptcy attorney for the lack of disclosure about the transfer of the 2010 Note must fail.  The Court also notes that the Debtor met with his former counsel prior to filing his Schedules in the Second Chapter 11 Case, and the Debtor also signed his Schedules and SOFA before they were filed in the Second Chapter 11 Case.  [Finding of Fact No. 25].  Case law is clear that a debtor's defense of reliance upon an attorney is undermined when a debtor admits to meeting with his counsel and personally reading and signing his Schedules and SOFA.  *See, e.g.*, *Tow v. Henley (In re Henley)*, 480 B.R. 708, 791–92 (Bankr. S.D. Tex. 2012); *Gebhardt v. Gartner (In re Gartner)*, 326 B.R. 357, 374 (Bankr. S.D. Tex. 2006) ("[T]his defense is only available where the debtor's reliance was reasonable and in good

faith.  The reasonableness of the debtor's reliance is undermined where the debtor has admitted under oath to having read and signed the Schedules and [SOFA] . . . .") (citations omitted).  To the extent that the Debtor relied upon his bankruptcy attorney in the Second Chapter 11 Case for legal assistance—including, but not limited to, filing his Schedules, SOFA, and MORs—any reliance was based on his own misinformation and nondisclosure.  Any reliance on his counsel for such nondisclosure was—and still is—unreasonable.

With respect to the Debtor's failure to properly answer item 10 of his SOFA in the Pending Chapter 7 Case—namely, that the transfer of the 2010 Note occurred within two years of the filing of the Debtor's Chapter 7 petition [Findings of Fact Nos. 39 & 40]—the Debtor chooses not to blame the attorneys who are presently representing him in this case.  Rather, the Debtor contends that he did not disclose the transfer because it was in the ordinary course of his real estate business, and item 10 expressly excludes the need to disclose transfers made in the ordinary course of business.   [Oct. 1, 2013 Tr. 103:18–104:9 & 104:16–24].   The Court subsequently addresses why this argument is unavailing.  *See* Section IV(C)(1).

Finally, counsel for the Debtor has cited an opinion written by one of the undersigned judge's colleagues, Bankruptcy Judge Letitia Z. Paul, in support of the proposition that the Debtor did not intentionally fail to explain the disappearance of the 2010 Note.  The opinion cited by counsel is *In re Ellis*, 454 B.R. 404 (Bankr. S.D. Tex. 2011).  In that case, the Chapter 7 trustee objected to the debtors' claimed homestead exemption under § 522(o), and a key issue was whether the debtors' sale of certain non-exempt real estate, and the use of the sale proceeds to make improvements on their homestead, constituted disposition of non-exempt property with the intent to hinder, delay or defraud creditors.  *Id.*  Bankruptcy Judge Paul held that the debtors did not commit fraud due to the totality of the following circumstances: (1) the debtors were

unsophisticated; (2) the debtors provided documents to their counsel, but their counsel did not actually meet with the debtors and review with them their Schedules and SOFA before filing these documents; (3) the debtor "quickly flipped through the [Schedules and SOFA], and then signed them"; and (4) debtor Floyd Ellis testified that he believed these non-exempt properties were actually exempt, and Judge Paul expressly found Mr. Ellis to be credible. *Id.* at 409, 411.

In the case at bar, none of these circumstances exist. First, the Debtor is highly sophisticated. [*See* Findings of Fact Nos. 1–7]. Second, in the Second Chapter 11 Case, the Debtor provided his attorney with the information set forth in these Schedules and SOFA; the Debtor reviewed these Schedules and SOFA with his attorney; and after do so, the Debtor authorized his attorney to file these documents. [Finding of Fact No. 25]. Third, there is no evidence that the Debtor quickly glanced at the Schedules and SOFA that he filed in the Second Chapter 11 Case; just the contrary: the Debtor reviewed these documents and expressly approved their filing. [*Id.*]. Fourth, the Debtor's testimony is not credible, and this Court gives his testimony little weight. *See supra* Section III on Credibility. In sum, the facts in *Ellis* are completely inapposite to the facts in the case at bar. The Debtor here can in no way stand in the shoes of the debtors in *Ellis*.

For all of the reasons set forth above, the Court finds that this twelfth badge of fraud is present in the case at bar.

**m.    THE THIRTEENTH BADGE: Has the Debtor engaged in a pattern of "sharp dealing" prior to bankruptcy?**

This Court has construed "sharp dealing" to mean "unethical action and trickery." *In re Sissom*, 366 B.R. 677, 700 n.34 (Bankr. S.D. Tex. 2007) (quoting BLACK'S LAW DICTIONARY 1381 (7th ed.1999)). Prior to the Pending Chapter 7 Case, the Debtor engaged in a course of sharp dealing throughout both the First Chapter 11 Case and the Second Chapter 11

Case.  He also engaged in a course of "sharp dealing" before he ever filed a bankruptcy petition. The Court now discusses the Debtor's "sharp dealing" in all of these respects.

> i.   *The Debtor's "Sharp Dealing" Relating to the First Chapter 11 Case*

In the First Chapter 11 Case, the Debtor misrepresented and omitted material information from his Schedules and SOFA.  The Debtor misrepresented that he had a property interest in Unit 320 on Schedule A, when in fact he had none.  [Findings of Fact Nos. 17 & 20].  Thus, the Debtor, using unethical means (i.e., lying on his Schedules under oath), was attempting to trick his creditors into believing that he already owned Unit 320, thus creating the ruse that was necessary to avoid any creditor at any time ever contemplating that the Debtor would forgive MELP's debt to him in the future in order to acquire a warranty deed for Unit 320.

Another form of the Debtor's "sharp dealing" came when the Debtor listed MELP's debt of $286,847.92 on Schedule B, but he failed to disclose that a promissory note evidenced this debt—i.e., the 2008 Note.  [Finding of Fact No. 18].  This omission is important because, once again, any creditor or trustee subsequently assessing the Debtor's acquisition of Unit 320 could be easily confused—particularly if he or she was examining the March 11, 2011 Transaction when the Debtor transferred the 2010 Note to MELP.  Stated differently, when the Trustee began investigating the legitimacy of the Debtor's homestead exemption claim in the Pending Chapter 7 Case, he could not at all discern the relationship among the 2008 Note, the 2010 Note, and the Debtor's acquisition of Unit 320 because the Debtor never disclosed that the obligation owed by MELP to him was in the form of a promissory note.  The Debtor hid the existence of the 2008 Note so that no one would be able to discern that he would be using this Note to obtain another Note (i.e. the 2010 Note) in order to acquire Unit 320.[50]  [*See* Findings of Fact Nos. 10, 18, 20,

---

[50] *See supra* note 29.

21, 27, 33, 34].  The Trustee had to spend considerable time ferreting out this information.  Thus, the Debtor's unethical act was to once again lie under oath in order to make it difficult for any creditor or the Trustee to easily discern how he acquired Unit 320.  These circumstances constitute "sharp dealing."

> ii.    The Debtor's "Sharp Dealing" Relating to the Second Chapter 11 Case

The Debtor's "sharp dealing" in the Second Chapter 11 Case involved a multitude of false representations in his Schedules, SOFA, and MOR—all of which were designed to trick his creditors into believing that when he filed his second Chapter 11 petition he already owned Unit 320 in fee simple, and to hide from them that he would subsequently be transferring the 2010 Note to acquire title to Unit 320.

First, in his Schedule A, the Debtor once again represented that he held a fee simple interest in Unit 320 [Finding of Fact No. 26], but his new, contractual interest in Unit 320 fell short of a fee simple interest.  The CSA and the Contract for Deed reflect that on the date of the filing of the Second Chapter 11 Case, the Debtor's interest in Unit 320 was **not** a fee simple interest, but rather a contractual right to purchase Unit 320 if he satisfied certain conditions in the future.  [*See* Findings of Fact Nos. 20, 21, 22 & 33].  If creditors had known about the CSA and the Contract for Deed, they would have known that the Debtor did **not** own a fee simple interest in Unit 320, but rather had a right to subsequently purchase the fee simple interest by, among other means, transferring the 2010 Note to MELP as part of the purchase price.  Thus, by falsely representing that on May 19, 2010 he owned a fee simple interest in Unit 320, the Debtor concealed from his creditors that he would subsequently be transferring the 2010 Note to MELP in order to acquire a fee simple interest in Unit 320.  His misrepresentation constitutes "sharp dealing" with his creditors.

68

Second, Schedule B represented that MELP owed $37,543.56 to the Debtor. [Finding of Fact No. 27]. This representation was also patently false. On the date of the commencement of the Second Chapter 11 Case, MELP owed $276,500.48 to the Debtor—which was the face amount of the 2010 Note acquired by the Debtor the previous day when he exchanged the 2008 Note for the 2010 Note [Findings of Fact Nos. 20, 21 & 33]. Thus, by falsely representing that MELP did not owe $276,500.48 on May 19, 2010, the Debtor concealed the existence of the 2010 Note, which thereby concealed the Debtor's transfer of the 2010 Note on March 11, 2011 to MELP in exchange for acquiring the warranty deed to Unit 320. Once again, the Debtor's unethical conduct was aimed at tricking his creditors. This is vintage "sharp dealing."

Third, the Debtor omitted the Contract for Deed from Schedule G. [Finding of Fact No. 29]. In Texas, land sale contracts are construed as executory contracts, and debtors who file for bankruptcy in Texas must disclose such contracts on their Schedule G. *Rancho Chamberino, Inc. v. B.F.W. Enters., Inc. (In re Rancho Chamberino, Inc.)*, 89 B.R. 597, 600 (W.D. Tex. 1987); *In re Wells*, 426 B.R. 579, 603 (Bankr. N.D. Tex. 2006) (noting that the debtor was required to disclose the executory contract on Schedule G, but he failed to do so); *In re Hendrickson*, No. 04–81261–BJH–13, 2005 WL 3670876, at *2 (Bankr. N.D. Tex. May 24, 2005); *In re Waldron*, 65 B.R. 169, 172 (Bankr. N.D. Tex. 1986); *Turoff v. Sheet (In re Sheets)*, 277 B.R. 298, 303 (Bankr. N.D. Tex. 2002); *In re Finley*, 138 B.R. 181, 182 (Bankr. E.D. Tex. 1992) ("[A]fter a review of relevant Texas law, this Court can come to no other conclusion but that a contract for deed is an executory contract under Texas law."). By failing to disclose the Contract for Deed on his Schedule G, the Debtor prevented his creditors from ever knowing about the Contract for Deed, and the express reference to the 2010 Note contained therein; and by hiding this information from his creditors, these creditors could never know that the Debtor

had the right to exchange the 2010 Note for the warranty deed to Unit 320.  Thus, when the Debtor did subsequently transfer the 2010 Note to MELP, the Debtor's creditors were totally in the dark about this transaction.  Under these circumstances, the Court finds that the Debtor's conduct constitutes "sharp dealing."

Fourth, the Debtor failed to disclose that he transferred the 2008 Note to MELP in exchange for the 2010 Note.  [Finding of Fact No. 30].  The Debtor should have disclosed this transfer in responding to item number 10 of the SOFA, which requires the Debtor to "[l]ist all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case."[51]  By concealing the transfer of the 2008 Note, the Debtor thereby concealed the existence of the 2010 Note, and therefore, concealed the eventual transfer of the 2010 Note to MELP in exchange for acquiring the warranty deed to Unit 320.  The Debtor's concealment constitutes "sharp dealing" with his creditors.

Fifth, the Debtor contends that he disclosed the existence of the 2010 Note by representing on his Schedule B that the balance of this Note was applied to the $289,000.00 purchase price of Unit 320.  [Oct. 1, 2013 Tr. 99:5–100:6 & 100:21–23].  Specifically, the Debtor made the following disclosure: "$277,543.56 settlement with $240,000 applied to Unit #320 purchase pursuant to settlement agreement." [Finding of Fact No. 27].  Yet, at the time the Debtor filed this Schedule (on May 19, 2010), the $240,000.00 had **not** yet been applied to Unit 320's purchase price.  [*See* Finding of Fact No. 33].  That application did not occur until ten months later on March 11, 2011, when the Debtor surrendered the 2010 Note with the

---

[51] The Debtor's explanation for his failure to disclose his transfer of the 2008 Note is that the exchange of this Note for the 2010 Note was in the ordinary course of his real estate business.  [Oct. 1, 2013 Tr. 103:18–104:9 & 104:16–24].  In a subsequent section of this Opinion [*see* Section IV(C)(1)], this Court addresses the "ordinary course of business" defense and explains why the Debtor cannot successfully assert it.

handwritten phrase, "Pd in full," to MELP as part of the purchase price for the Debtor to acquire a fee simple interest in Unit 320; and the amount of the application was not $240,000.00, as represented by the Debtor on Schedule B, but rather, $236,120.00. [*Id.*]. Thus, by falsely representing that as of May 19, 2010, $240,000.00 had been applied, the Debtor concealed the existence of the 2010 Note as of that same date, thereby allowing the Debtor to conceal the eventual transfer of the 2010 Note (and the application of the balance of that Note, which was $236,120.00) on March 11, 2011 to MELP to acquire the warranty deed to Unit 320. These misrepresentations constitute "sharp dealing."

Sixth, the Debtor further dissembled by his representations in Schedule A of a nonexistent claim for $49,000.00 secured by Unit 320. [Finding of Fact No. 26]. This representation was patently false. On the date of the filing of the Second Chapter 11 Case (i.e., May 19, 2010), no creditor held a $49,000 lien on Unit 320. The Debtor testified that this $49,000 lien belonged to MELP, but this testimony is not credible for two reasons. [*Id.*]. First, MELP did not acquire a lien on Unit 320 until March 11, 2011 when the Debtor executed and delivered the Deed of Trust to MELP. [Finding of Fact No. 33]. Second, the amount of lien was **not** $49,000.00, but rather $52,880.80, as evidenced by not only the Deed of Trust, but by the $52,880.00 Note that the Debtor executed and delivered to MELP on March 11, 2011. [*Id.*]. Thus, by leading his creditors to believe that a $49,000.00 lien already existed on Unit 320 as of May 19, 2010, the Debtor concealed that he could subsequently give MELP a lien of $52,880.00 pursuant to the Deed of Trust—the amount of which lien was determined after the balance of the undisclosed 2010 Note was first applied against the purchase price of $289,000.00. The Debtor's machinations in this respect constitute "sharp dealing."

Seventh, the Debtor also failed to disclose his transfer of the 2010 Note to MELP in his March, 2011 MOR.  [Finding of Fact No. 35].  Rather, on the third page of this MOR, the Debtor merely wrote, in his own handwriting, that he disbursed $2,387.60 in closing costs for the sale of Unit 320.  Yet, on page 1 of the same MOR, the Debtor misleadingly represented that he disposed of no assets outside the normal course of business, and he expressly omitted his surrender of the 2010 Note to MELP, valued at the time at $236,120.00.  [*Id.*].  Once again, the Debtor's misleading representations constitute "sharp dealing."

Eighth, as a debtor-in-possession, the Debtor was required to obtain this the Court's approval to effectuate the March 11, 2011 Transaction under § 363(b)(1)[52] so that his creditors would receive notice and an opportunity to object to the proposed transaction.[53]  *See, e.g.*, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, LLC)*, 650 F.3d 593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession . . . to satisfy its fiduciary duty the . . . creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (quoting *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986)).

---

[52] Section 363(b)(1) provides that a debtor-in-possession, "<u>after notice and hearing</u>, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1) (emphasis added).  In a subsequent section of this Opinion [*see* Section IV(C)(1)], this Court concludes that the Debtor did not acquire Unit 320 in the ordinary course of his real estate business.

[53] Indeed, bankruptcy courts have found "[t]he usual effect of a sale or lease of property of the estate, conducted outside of the ordinary course of business but without adherence to the notice and hearing requirements of § 363(b)(1), is that any sale held is rendered null and void."  *In re Koneta*, 357 B.R. 540, 543 (Bankr. D. Ariz. 2006); *see also Austin v. BFW Liquidation, LLC (In re BFW Liquidation, LLC)*, 471 B.R. 652, 671 (Bankr. N.D. Ala. 2012); *Command Performance Operators, Inc. v. First Int'l Servs. Corp. (In re First Int'l Servs. Corp.)*, 25 B.R. 66, 70–71 (Bankr. D. Conn. 1982) (finding that a secret transfer of all the debtor corporations' shares to a buyer was out of the ordinary course of business and void because it was conducted in violation of § 363(b), but also because the transfer violated the principles of equity.).

The court in *Patriot Place* held that "[a] transaction by a Chapter 11 debtor that outside the ordinary course of its business and lacks court approval is unenforceable, ineffective, and void."  *Patriot Place,* 486 B.R. at 793 (citations omitted).  This Court notes that the Trustee has **not** requested this Court to issue an order declaring that the March 11, 2011 Transaction is void—which would have the effect of restoring the 2010 Note to the estate as well as giving the estate the right to acquire Unit 320 under the Contract for Deed.  To obtain such relief, the Trustee would have to file an adversary proceeding against both the Debtor and MELP.  *See* FED. R. BANKR. P. 7001.

The Debtor's failure to comply with § 363 constitutes "sharp dealing": he breached his fiduciary duty to his creditors by not giving them notice of the specific details of the March 11, 2011 Transaction, thereby duping them into believing that he already had fee simple title to Unit 320.

In sum, the Debtor engaged in a protracted series of misstatements, false statements, omissions, and insufficient disclosures in the First Chapter 11 Case and the Second Chapter in Case—all designed to obfuscate the Debtor's use of a non-exempt asset (i.e., the 2010 Note) to acquire what he now claims is his exempt homestead (i.e., Unit 320). The Debtor's conduct easily constitutes "sharp dealing." His conduct is made even worse by virtue of his failure to ever file a proposed plan to repay his creditors [Finding of Fact No. 36].

### iii. The Debtor's "Sharp Dealing" Prior to All of His Bankruptcy Filings

Finally, the Debtor has exhibited "sharp dealing" in an entirely non-bankruptcy context. In 2006, the Debtor conspired with several others to wrongfully deprive properly perfected lienholders of thousands of dollars from foreclosure sales. These lienholders filed suit against the Debtor in the Second Chapter 11 Case to prevent his discharge under § 523 (a)(2), (4) and (6), and this Court adjudicated this proceeding in a multi-day trial. This Court found that the Debtor owed the lienholders the amounts of $268,477.78, $182,704.48, and $120,002.97, respectively, and then issued judgments denying discharge of these three particular debts. [Adv. No. 10-03583, Doc. No. 55; Adv. No. 10-03584, Doc. No. 59; Adv. No. 10-03585, Doc. No. 66]. The Court issued a Memorandum Opinion, which sets forth in detail the actions of the Debtor that led this Court to conclude that he had committed larceny and injured these lienholders. *See Memorandum Opinion on Nondischargeability of Debts Pursuant to §§ 523(A)(4) and 523(A)(6).* [Adv. No. 10-03583, Doc. No. 53; Adv. No. 10-03584, Doc. No. 56; Adv. No. 10-03585, Doc. No.

61]; *Countrywide Home Loans, Inc. v. Cowin*, 492 B.R. 858 (Bankr. S.D. Tex 2013). The Debtor's skullduggery in this regard constitutes "sharp dealing."[54]

Under all of the circumstances set forth above, the Court finds that this thirteenth badge of fraud is present.

**n.     A sufficient number of badges of fraud are present to infer the Debtor's fraudulent intent**

The Court finds that the Trustee has established nine of the thirteen badges of fraud. In doing so, the Trustee has more than adequately met his burden of proof in showing that the Debtor disposed of a non-exempt asset (i.e., the 2010 Note) with the intent to hinder, delay, or defraud his creditors. *See e.g., Roland v. United States*, 838 F.2d 1400, 1403 (5th Cir. 1988) ("When several of these indicia of fraud are found, they can be a proper basis for an inference of fraud."); *Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1271, n.17 (11th Cir. 1998) ("Although the presence of one specific 'badge' will not be sufficient to establish fraudulent intent, the 'confluence of several can constitute conclusive evidence of an actual intent to defraud.'") (citing *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1354 (8th Cir. 1995)); *Havis v. AIG Sunamerica Life Assurance Co. (In re Bossart)*, Bankr. No. 05–34015–H4–7, Adv. No. 06–3540, 2007 WL 4561300, at *16 (Bankr. S.D. Tex Dec. 21, 2007) (stating that "[t]here is no magic number of badges that conclusively establishes fraudulent intent; but a concurrence of several badges of fraud in the same case makes a strong argument for fraud," and holding that eight badges of fraud was sufficient to find fraudulent intent). This Court wants to

---

[54] At the hearing on the Objection, the Trustee moved to admit the Memorandum Opinion into the record as an exhibit in order to help establish that the Debtor has committed "sharp dealing" in the past. Counsel for the Debtor objected, and this Court overruled the Objection and admitted the opinion as an exhibit. The Court wants to emphasize that even if it had sustained the objection and not admitted the Memorandum Opinion—thereby leaving the record completely devoid as to the Debtor's skullduggery from the actions discussed in the Opinion—the Court would still find that the Debtor has a pattern of "sharp dealing" based upon all of his misrepresentations, obfuscation, and delay relating to his Schedules, SOFA, and MOR from the First Chapter 11 Case and the Second Chapter 11 Case—all of which conduct is part of the record made at the hearing on the Objection in the Pending Chapter 7 Case.

emphasize that even if the Trustee has only established a few of these badges—particularly the third, seventh, and tenth—this Court would still conclude that the Debtor disposed of the 2010 Note with intent to defraud his creditors.  *See, e.g.*, *In re Sherman*, 67 F.3d at 1354–55 (affirming the bankruptcy court's finding of the presence five badges of fraud—the first, third, fourth, fifth, and ninth badges).

Accordingly, the Trustee has satisfied the fourth element of § 522(o).

5.   Summary of the Elements of § 522(o)

Based upon the analysis set forth above (in this Section IV(B)), the Trustee has satisfied all four elements of § 522(o).  Specifically, he has proven that within ten years of the Pending Chapter 7 Case, the Debtor disposed of non-exempt property (the 2010 Note) to purchase a new homestead (Unit 320), and he did so with the intent to hinder, delay, or defraud his creditors.  Accordingly, unless the Debtor has some meritorious defense, the value of his homestead exemption in Unit 320 must be reduced by $236,120.00, which is the value of the 2010 Note that the Debtor transferred to MELP to acquire the warranty deed to Unit 320.  The Debtor contends that he does have some defenses, which this Court now addresses.

**C.    The Debtor's Defenses**

1.    The "Ordinary Course of Business" Defense

The Debtor argues that he did not need to disclose his transfer of the 2010 Note to MELP, or obtain this Court's approval to acquire Unit 320, because the March 11, 2011 Transaction was done in the ordinary course of his real estate business.  The Court rejects this argument for several reasons.

Item 10 of the SOFA requires the Debtor to "[l]ist all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred

either absolutely or as security within two years immediately preceding the commencement of this case." (emphasis added). "Neither the SOFA nor the Bankruptcy Code define the phrase 'in the ordinary course of business or financial affairs' with respect to Question 10." *Stamat v. Neary*, 635 F.3d 974, 980 (7th Cir. 2011). Thus, this Court looks to case law for guidance.

Courts that have considered the meaning of the phrase have offered at least two approaches to ascertain whether a particular postpetition transaction is in the "ordinary course of business."[55] The first approach is aptly described in *In re Media Cent., Inc.*, 115 B.R. 119, 123 (Bankr. E.D. Tenn. 1990):

> One approach is to focus upon the creditor's expectation; that is, one views the disputed transaction from the creditor's vantage point and inquires whether the creditor would expect notice and hearing on the contemplated transaction. If the transaction is an ordinary one in the debtor's business operation, the creditor would not expect notice and opportunity to object because the creditor is well aware the debtor-in-possession has been authorized by the Code to operate its business in the usual manner from day to day. On the other hand, if the contemplated transaction is unusual, not of the ordinary, the type of transaction that might be considered controversial or questionable for the debtor to undertake during its Chapter 11 case, the creditors would expect to be notified and provided an opportunity to object.

*Id.* at 123–24 (citation omitted); *see also, In re Patriot Place, Ltd.*, 486 B.R. 773, 792-94 (Bankr. W.D. Tex. 2013); *In re Sportsman's Warehouse, Inc.*, 457 B.R. 372, 399–00 (Bankr. D. Del. 2011).

The second approach is to focus on comparable businesses; specifically, "to compare the debtor's business with like businesses to ascertain whether the disputed transaction is ordinary for the particular type of business concerned." *In re Media Cent.*, 115 B.R. at 124. The focus of the "comparable businesses" test is "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." *Id.* (quoting *Burlington N. R.R. Co. v.*

---

[55] Many courts refer to these two approaches as the "vertical dimension" test and the "horizontal dimension" test. *See In re Media Cent., Inc.*, 115 B.R. 119, 124 (Bankr. E.D. Tenn. 1990). The undersigned judge prefers to refer to these approaches as the "creditor expectation test" and the "comparable businesses" test, respectively. *See id.*

*Dant & Russell, Inc. (In re Dant & Russell, Inc.)*,853 F.2d 700, 704 (9th Cir. 1988); *Patriot Place*, 486 B.R. at 793-94; *Sportsman's Warehouse*, 457 B.R. at 399-400.

In assessing whether the party can prevail in asserting the "ordinary course of business" defense, the court in *Media Central* noted that "[i]f either test or dimension is not satisfied, most likely the disputed transaction is not in the ordinary course of business." *In re Media Cent.*, 115 B.R. at 124.  Application of the "creditor expectation" test and the "comparable businesses" test in the case at bar leads this Court to conclude that the Debtor did not acquire Unit 320 in the ordinary course of his real estate business.

### a.    The "creditor expectation test"

Would a creditor of the Debtor expect notice and a hearing regarding his acquisition of Unit 320?  Stated differently, was the Debtor's acquisition of Unit 320 an ordinary transaction in his real estate business or was it unusual? If it was ordinary, then a creditor would not expect notice and an opportunity to object; if it was unusual, then a creditor would expect notice and an opportunity to object. In the case at bar, the Debtor testified that "generally it [i.e., the nature of his business] was development of real estate that's the largest portion. But then real estate, real estate sales as a realtor.  Some buying and selling of real estate." [Oct. 1, 2013 Tr. 43:3–6] (emphasis added). This testimony alone suffices to show that the Debtor's acquisition of Unit 320—which the Debtor acquired through surrendering the 2010 Note and executing and delivering the $52,880.00 Note and the Deed of Trust to MELP [Finding of Fact No. 33]—was an atypical transaction given the Debtor's primary business of developing real estate.  It simply strains credulity to argue that the Debtor's acquisition of an existing condominium unit to serve as his homestead constitutes the development of real estate.  *See* BLACK'S LAW DICTIONARY 462 (7th ed. 1999) (defining "development" as: "a human-created change to improved or unimproved

real estate, including buildings or other structures . . . [and] "[a]n activity, action, or alteration that changes undeveloped property into developed property."

There is plenty of additional testimony from the Debtor demonstrating that his acquisition of Unit 320 was unusual given the ordinary course of his real estate business.  The Debtor's testimony set forth below (adduced by the Trustee's counsel) is particularly telling:

> Q: And you acquired your interest in that property [Unit 320] as part of a Settlement Agreement in litigation, correct?
>
> A: Yes.
>
> Q: Okay. And you acquired your interest in that property pursuant to a Residential Contract for Deed, correct?
>
> A: In the Settlement Agreement, yes.
>
> Q: And you also acquired that property by surrendering a Promissory Note [i.e., the 2010 Note] in partial satisfaction of the purchase price; is that correct?
>
> A: That was part of the sequence of the events, yes.
>
> Q: Okay. So other than 2111 Welch Street in Houston, is it fair to say that all of the properties listed here on your Schedules A in your prior Chapter 11 case, Unit 320 was the only one you acquired as your homestead?
>
> A: Yes.
>
> Q: Okay. And is to fair to say that of all the properties listed here, Unit 320 was the only property you acquired through a Settlement Agreement and litigation; is that correct?
>
> A: Through a Settlement Agreement—I didn't understand the word litigation. I mean, how that—
>
> Q: Well the Settlement Agreement was a settlement of litigation, correct?
>
> A: Yes.
>
> Q: Okay. So that's what I mean when I say that.
>
> A: Okay.
>
> Q: So of all the properties listed here, Unit 320 was the only property you acquired through a Settlement Agreement, correct?

A: Correct.

Q: And of all the properties listed here, Unit 320 was the only property you acquired through a Residential Contract for Deed, correct?

A: Correct.

Q: And of all the properties listed here, Unit 320 was the only one you surrendered a pre-existing Promissory Note as part of the purchase price. Correct?

A: Yes.

Q: During the last 10 years, how many properties have you acquired as part of a Settlement Agreement of litigation, other than Unit 320?

A: None that I recall.

Q: During the last 10 years, how many properties have you acquired through a Residential Contract for Deed, other than Unit 320?

A: Could you repeat the question?

Q: During the last 10 years, how many properties have you acquired through a Residential Contract for Deed, other than Unit 320?

A: I don't recall any.

Q: During the last 10 years, how many properties have you acquired by surrendering a Promissory Note in partial satisfaction of the purchase price?

A: I don't recall any.

Q: Please turn to Trustee's Exhibit 18, if you would.  I'll represent to you that these are the Schedules filed in this Chapter 7 case.  Please turn to page 50. That should be part of the Statement of Financial Affairs that you filed in this Chapter 7 case.

A: Yes.

Q: This is the part where you list all the business entities in which you've held an interest.  Do you see that?

A: What item?  Oh, page 50.  Sorry.

Q: Yes.  So beginning -- in response to your -- to question 18, you've listed a number of different business entities in which you hold an interest, correct?

A: Yes.

Q: Now is it fair to say that most of these are business entities you set up to carry out your real estate business?

A: Well, they're set up to carry out various businesses, most of which seem – are real estate – involve real estate.

Q: Thank you. Now, how many of these business entities has purchased property that you intended to claim as your homestead?

A: None.

Q: And how many of these business entities have acquired a piece of property pursuant to a Settlement Agreement of litigation?

A: None that I can recall.

Q: And how many of these business entities have acquired property through a Residential Contract for Deed?

A: None that I can recall.

Q: And how many of these entities have acquired property by surrendering a Promissory Note in partial satisfaction of the purchase price?

A: None that I recall.

[Oct. 1, 2013  Tr. 45:22–49:38].

This testimony underscores that the Debtor's acquisition of Unit 320 was most certainly **not** in the ordinary course of his real estate business.  Indeed, the Debtor acknowledged that of all of the numerous properties that he acquired in his real estate business, his acquisition of Unit 320 was the only one acquired through a contract for deed and the surrender of a promissory note.

In sum, the Debtor's acquisition of Unit 320 was through a transaction distinctly **outside** the ordinary course of the Debtor's business.  Indeed, the debtor presented no evidence that any of his creditors would have expected him to acquire Unit 320 by surrendering the 2010 Note and incurring more debt through the execution and delivery to MELP of the $52,880 Note.  Accordingly, this Court concludes that the Debtor's position today that his acquisition of Unit

320 was in the ordinary course of his real estate business is nothing more than a poorly concocted explanation developed as trial strategy in an effort to justify the Debtor's failure to disclose the transfer of the 2010 Note to MELP in the March 11, 2011 Transaction.  This strategy will not work.

### b.    The "comparable businesses" test[56]

Was the Debtor's acquisition of Unit 320 of a type that other similar businesses would engage in?  The Debtor introduced no testimony on this point.  It is not surprising that he failed to do so.  This is because there are no real estate businesses whose mission is to acquire a homestead through settlement of litigation and the surrender of a note receivable.

The Debtor has thus failed to establish that his transfer of the 2010 Note was in the ordinary course of his real estate business through either the "creditor expectation" test or the "comparable businesses" test.   Accordingly, this Court concludes that the Debtor's ordinary course of business defense fails.

### 2.    The "Inquiry Notice" Defense

The Debtor next contends that even though he did not make complete disclosure of the transfer of the 2010 Note on March 11, 2011, he nevertheless provided sufficient disclosure to constitute what his counsel argues is "inquiry notice."   For example, by setting forth on the March, 2011 MOR that "This note of $52,880 is that secured claim on unit 320 claimed under Schedule C – Exempt Property intended homestead," [Finding of Fact No. 35] the Debtor

---

[56] At least one court has expressed the view that this test—which is also known as the "horizontal dimensions test"—is, as a matter of law, inapplicable, and that the only test to be used is the "reasonable expectations test" (otherwise known as the "vertical dimensions test").  *See Martino v. First Nat'l Bank of Harvey (In re Garofalo's Finer Foods, Inc.)*, 186 B.R. 414, 430 ("Accordingly, this court concludes as a matter of law that the reasonable expectations test is the *only* test to be used to determine whether [the transaction was] within the ordinary course of business.").  This Court finds some merit to this ruling—at least as to the analysis in a § 522(o) objection regarding whether the transfer in question was in the ordinary course of business.  However, because most courts have applied the "comparable businesses" test, this Court, out of an abundance of caution, will assume that this test is applicable in a § 522(o) objection, and will therefore apply this test in the case at bar.

contends that he made sufficient disclosure to put his creditors on notice that he had acquired Unit 320; and that, having been put on notice, it was their duty to make further inquiry to determine just exactly how he acquired Unit 320.  [*See* Dec. 3, 2013 Tr. at 78:3–12].   This Court disagrees.

It is true that "Texas law recognizes the doctrine of inquiry notice, triggered by notice of facts that would put a reasonably prudent person on a duty of inquiry."  *Realty Portfolio, Inc. v. Hamilton (In re Hamilton)*, 125 F.3d 292, 299 (5th Cir. 1997).  In *Hamilton*, for example, the Fifth Circuit held that inquiry notice was applicable in a § 544(a) action where a Chapter 13 debtor sought to avoid a prepetition foreclosure conveyance.  *Id.* at 295, 299–00.  In the case at bar, the Debtor seems to believe that the same "inquiry notice" principle applies with respect to creditors reviewing his Schedules and SOFA.  He is wrong.

First, *Hamilton* is easily distinguishable from the case at bar.  *Hamilton* concerned an avoidance action where the "inquiry notice" test was applied to a third-party purchaser of property of the estate, not to creditors of the debtor.  This Court has found no cases, and counsel for the Debtor has cited no cases, for the proposition that a debtor can defeat an objection to his homestead exemption by arguing that he provided just enough information in his MOR to put creditors on notice so that they had a duty to conduct a diligent inquiry which would presumably have resulted in objections to the Debtor's acquisition of Unit 320 as his homestead

Indeed, the Debtor's "inquiry notice" argument flies in the face of the Fifth Circuit's decision in *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174 (5th Cir. 1992).  There, the Fifth Circuit reviewed the elements that a trustee or creditor must prove to successfully prevail on an objection to the discharge of a debtor under § 727(a)(4)(A).  Although the dispute at bar is an objection to the Debtor's claimed exemption, not to his discharge, *Beaubouef* is nevertheless

applicable.  This is so because one of the elements of § 727(a)(4)(A) is that the debtor made the false statement with fraudulent intent; and one of the issues in the case at bar is whether the Debtor disposed of the 2010 Note with the intent to hinder, delay, or defraud his creditors.  *See also Cipolla v. Roberts (In re Cipolla)*, 476 Fed. Appx. 301, 306 (5th Cir. 2012) ("Likewise, under Code § 727(a)(2), a debtor who, *inter alia*, transfers or conceals property 'with intent to hinder, delay, or defraud a creditor' within one year before the petition date may not receive a discharge.  Given these similarities in language, courts have looked to decisions interpreting . . . 727(a)(2) when interpreting § 522(o).").

In *Beaubouef*, the debtor had amended his Schedules but failed to clear up all the inconsistencies and omissions.  *In re Beaubouef*, 966 F.2d at 178.  The bankruptcy court determined that the debtor's inadequate and inaccurate disclosure constituted reckless indifference to the truth and therefore established the requisite intent to deceive.  *Id.*  The debtor appealed.  *Id.* at 175.  In affirming, the Fifth Circuit held that:

> Full disclosure of assets and liabilities in the schedules required to be filed by one seeking relief under Chapter 7 is essential, because the schedules "serve the important purpose of insuring that adequate information is available for the Trustee and creditors without need for investigation to determine whether the information provided is true."

*Id.* at 179 (citation omitted); *see also* In *re Wells*, 426 B.R. 579, 605 (Bankr. N.D. Tex. 2006) ("When a debtor files for [bankruptcy], he is required to literally open all his records for the trustee's inspection.")  (citation omitted).  The Fifth Circuit thus concluded that the debtor, in failing to make complete disclosure, had recklessly disregarded the truth, and therefore had intended to defraud his creditors.  *In re Beaubouef*, 966 F.2d at 178 ("[T]he existence of more than one falsehood, together with [the Debtor's] failure to take advantage of the opportunity to

clear up all inconsistencies and omissions when he filed his amended schedules, constituted reckless indifference to the truth and, therefore, the requisite intent to deceive.").

In the dispute at bar, the Debtor's inadequate and inaccurate disclosure regarding his surrender of the 2010 Note to acquire Unit 320 constitutes the same degree of reckless indifference to the truth as in *Beaubouef*.  Creditors and trustees who review a debtor's Schedules, SOFA, and MORs "are not like pigs, hunting for truffles" buried in handwritten comments from the debtor in his MORs.[57] Rather, the information which a debtor provides to creditors in his Schedules, SOFA and MORs should be completely transparent and accurate. Here, the Debtor's Schedules, SOFA and MOR were anything but transparent—at least as to the existence of the 2010 Note and the Debtor's transfer of this Note to MELP.  The meager morsels of information which the Debtor disclosed about his assets and liabilities that have some connection to the 2010 Note—which he never disclosed—do not come within haling distance of the level of transparency and accuracy required by the Code and *Beaubouef*.  What the Code and *Beaubouef* require is that the Debtor—in his Schedules, SOFA, and MOR—disclose to his creditors the truth, the whole truth, and nothing but the truth.  The "inquiry notice" argument does not, as a matter of law, apply to creditors when reviewing the information that the Debtor has filed under oath in the bankruptcy court.

Second, even if the "inquiry notice" principle applies in a § 522(o) objection, the Fifth Circuit has stated that:

> The duty of inquiry is governed by standards of reasonableness, extending to "those things which a reasonably diligent inquiry and exercise of the means of information at hand would have discovered."  *Woodward*, 237 S.W.2d at 289; *see also Prewitt*, 792 F.2d at 1359 ("a *reasonably diligent* inquiry and exercise of the *means of information at hand* ") (emphasis added); *In re Spring Creek Invs.*, 71 B.R. at 160 ("the duty does not extend to exhaustive inquiry or investigation of speculation and conjecture"); *Westland*, 637 S.W.2d at 908 ("*diligent* inquiry and

---

[57] *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

search") (emphasis added); *Flack v. First Nat'l Bank*, 148 Tex. 495, 226 S.W.2d 628, 631 (1950); *Hobbs v. Hutson*, 733 S.W.2d 269, 272 (Tex. App.—Texarkana 1987, writ denied) (citing *Miles v. Martin*, 159 Tex. 336, 321 S.W.2d 62 (1959)); *cf. Briggs v. Kent (In re Professional Inv. Props.)*, 955 F.2d 623, 627 (9th Cir.1992), *cert. denied, Miller v. Briggs*, 506 U.S. 818, 113 S.Ct. 63, 121 L.Ed.2d 31 (1992) ("[W]here a purchaser has knowledge of information of facts which are sufficient to put an *ordinarily prudent* man upon inquiry, and the inquiry, if followed with *reasonable diligence,* would lead to the discovery of defects in the title ... the purchaser will be held chargeable with knowledge thereof.") (emphasis added).

*In re Hamilton*, 125 F.3d 292, 300 (5th Cir. 1997).

In the case at bar, the question is whether the information that the Debtor provided in the March 2011 MOR was sufficient to lead an ordinarily prudent person to question whether the Debtor had transferred a non-exempt asset to acquire his homestead.  This Court, as the trier of fact, makes the determination as to whether an ordinarily prudent person had sufficient information from the MOR to justify inquiring about the Debtor's use of the 2010 Note to acquire Unit 320.  *Id.* at 301.

The Court finds that an ordinarily prudent person did **not** have sufficient information. Specifically, the Debtor's reference to the $52,880 Note in his MOR would not lead an ordinarily prudent person to become suspicious that the Debtor had surrendered an undisclosed non-exempt asset (the 2010 Note) in conjunction with the delivery of the $52,880 Note for the purpose of acquiring the warranty deed to Unit 320.  An ordinarily prudent creditor would not be able to somehow divine that the existence of the $52,880 Note is sufficiently suspicious to spend time making an inquiry that would lead to the discovery that the Debtor had not only executed the $52,880 Note, but had also surrendered the 2010 Note to MELP.  *See, e.g.*, *Holber v. Albert Kauffman (In re Keystone Surplus Metals, Inc.)*, 452 B.R. 554, 558–59, 561 (Bankr. E.D. Pa. 2011) (concluding that there was no evidence that the trustee was put on inquiry notice of the transfers because the debtor's principal failed to list the transfers in response to item #10 of his

SOFA, the trustee's reliance on the information in the SOFA was "perfectly reasonable," and the debtor's principal "may very well have actively misled the Trustee into believing no such transfers were made"); *Markus v. Fried (In re Geneva Steel LLC)*, 389 B.R. 231, 241–43 (Bankr. D. Utah 2008) (holding that the debtor failed to put the creditors and trustee on inquiry notice because it had a duty to disclose the material terms of a transfer of property in its Schedules and SOFA, but it failed to do so, constituting a material omission); *In re J & D Sciences, Inc.*, 335 B.R. 791, 799 (Bankr. M.D. Fla. 2006) (holding that the trustee was not put on inquiry notice of the debtor's prepetition transfer because of the "various fragments of information he was given during the course of his investigation," and the information was "inadequate to overcome the trustee's reasonable reliance on the debtor's misrepresentation that there had been 'no transfers' within the year before bankruptcy").

Indeed, the Debtor's statement on the MOR about the $52,880 Note was as follows: "Pre-petition secured claim of $49,000 was listed under Schedule A – Real Property.  This note of $52,880 is that secured claim on unit 320 claimed under Schedule C – Exempt Property intended homestead."  This language would lead any reasonable creditor to believe that the Debtor was simply telegraphing that the $52,880 Note was in existence on the date of the initiation of the Second Chapter 11 Case, and that the Debtor had simply mistakenly scheduled the claim to be $49,000.00 rather than $52,880.00—in other words that the claim of $52,880.00 did not arise in March of 2011, but rather was in place ten months earlier on the date of the initiation of the Second Chapter 11 Case.  This language simply does not put any ordinarily prudent creditor on inquiry notice of the Debtor's transfer of the 2010 Note to acquire Unit 320.

For all of these reasons, this Court concludes that the Trustee has established the Debtor's reckless indifference to the truth; therefore, the Trustee has established the Debtor's requisite

intent to deceive his creditors.  The Debtor's "inquiry notice" argument necessarily craters under the weight of this "reckless indifference" finding.  Finally, even if the Debtor was not recklessly indifferent to the truth, the language in his MOR of  March of 2011 does not put an ordinarily prudent creditor on inquiry notice of the transfer of the 2010 Note.

In sum, because the Debtor's defenses all fail, the Trustee, having satisfied all of the elements of § 522(o), is entitled to relief.

### V.  RELIEF TO BE GRANTED TO THE TRUSTEE

In the Objection, the Trustee requests the following relief in his Prayer paragraph: (1) to reduce the amount of the Debtor's claimed exemption with respect to Unit 320 in accordance with § 522(o); and (2) to enter an order directing the Debtor to make current payments to MELP as required under the $52,880 Note, and to make timely payments as necessary to pay property taxes, insurance, HOA fees, and other ongoing expenses necessary to preserve the value of the estate's interest in Unit 320.  [Doc. No. 83, p. 12].  The Trustee makes this second request by arguing that to the extent there is equity in Unit 320, at least $236,120.00 of this equity is property of the estate; and because the Debtor is using property of the estate in violation of the automatic stay, he must at least provide adequate protection pursuant to §§ 361 and 362(d).

The Court now addresses these two requests for relief.

A.      **Reduction of the Debtor's Claimed Exemption With Respect to Unit 320 in Accordance with § 522(o)**

Section 522(o) requires that the value of a debtor's homestead exemption "shall be reduced to the extent such value is attributable" to any non-exempt property fraudulently disposed of within the last ten years.  The value of the 2010 Note that the Debtor fraudulently transferred to MELP was $236,120.00.  [*See* Finding of Fact No. 33].  Therefore, the value of the Debtor's homestead exemption must be reduced by $236,120.00.

87

In the case at bar, the Debtor has represented that the value of Unit 320 is $240,598.00.[58] [Finding of Fact No. 42]. But, there are liens on Unit 320. The Debtor's Schedule D in the Pending Chapter 7 Case reflects that the amount of MELP's lien under the Deed of Trust as of the date of the filing of the Chapter 7 petition is $46,715.89; that the amount of the lien held by the HOA is $7,132.40; and that the two liens held by the IRS are $36,899.97 and $8,873.83, respectively. [Finding of Fact No. 43]. When these liens are subtracted from the amount of $240,598.00, the remainder is $140,975.91. The figure of $140,975.91 represents the Debtor's equity in Unit 320. However, as noted above, the value of the 2010 Note that the Debtor fraudulently transferred to MELP in order to acquire Unit 320 totaled $236,120.00. [Finding of Fact No. 33]. Because $236,120.00 exceeds $140,975.91, the Debtor, pursuant to § 522(o), has no equity in Unit 320. The entire equity of $140,975.91 now belongs to the Trustee for the benefit of the estate.

In *Sissom*, where this Court found that the debtor had fraudulently used $50,000.00 to purchase his alleged homestead, the Court awarded an equitable lien to the trustee for this amount on the homestead. *In re Sissom*, 366 B.R. 677, 714 (Bankr. S.D. Tex. 2007). The Court took this action in order to ensure that the purpose of § 522(o) is accomplished: namely that a debtor not be able to have unfettered use of his claimed homestead when he has acquired that homestead by fraudulently disposing of non-exempt assets. Awarding a $50,000.00 lien to the trustee ensured that the debtor in *Sissom* would not simply be able to walk away from his fraudulent conduct without returning to the estate the $50,000.00 that would have been available

---

[58] This Court, in the section on Credibility, has found the Debtor to a less than credible witness, and his poor credibility also applies to the value that he has placed on Unit 320. The Court is skeptical that the value of Unit 320 is only $240,598.00, as this unit is located in a very affluent area of Houston. There is, however, nothing else in the record to indicate a higher value; therefore, this Court will use the Debtor's own figure of $240,598.00 in awarding relief to the Trustee.

for distribution to creditors if the debtor had not used the money to purchase the homestead.[59]
*See Cipolla v. Roberts (In re Cipolla)*, 476 F. App'x. 301, 305 (5th Cir. 2012) (noting that
§ 522(o) "is intended to strike a balance between the rights of debtors and creditors in states with
unlimited homestead exemptions such as Texas and to make clear that abusive pre-bankruptcy
planning will not be tolerated at the expense of creditors.").

In the case at bar, the Debtor, like Mr. Sissom, fraudulently disposed of non-exempt
property to acquire his alleged homestead. Here, the Debtor transferred the 2010 Note to acquire
Unit 320. [Finding of Fact No. 33]. Because the 2010 Note had a value of $236,120.00 when
the Debtor transferred this instrument to MELP in order to acquire the warranty deed to Unit
320, this Court, just as it did in *Sissom*, awards an equitable lien to the Trustee on Unit 320.
Because the value of Unit 320—at least according to the Debtor's Schedule D, which is the only
evidence in the record—is only $240,598.00, and because there are existing liens which, in the
aggregate, total $99,622.09, the amount of value left for the estate is $140,975.91; therefore, at
least at this time, the Trustee now has an equitable lien on Unit 320 for $140,975.91. However,
if the Trustee holds a foreclosure sale in order to enforce his equitable lien, and Unit 320 is sold
for more than $240,598.00, then—after payment of MELP's lien, the HOA lien, and the IRS
liens—any proceeds in excess of $140,975.91 shall be remitted to the Trustee up to the amount
of $236,120.00. In its order sustaining the Objection, this Court will expressly set forth that the
Trustee may immediately foreclose his equitable lien on Unit 320.[60] Thus, unless the Trustee

---

[59] The Debtor did not have $50,000.00 in cash to immediately remit to the trustee. Awarding an equitable lien on
his homestead maximized the chances that the trustee would be able to recover the $50,000.00 for the estate. And,
he eventually did. According to the Trustee's Final Report, the Trustee was able to monetize the lien and, by doing
so, accumulated a net amount of $40,500.00 for the estate. [Case No. 06-31917, Doc. No. 162].

[60] In *Soulé v. Willcut (In re Willcut)*, 472 B.R. 88 (B.A.P. 10th Cir. 2012), the Chapter 7 trustee objected to the
debtor's homestead under § 522(o). The home lender's lien was approximately equal to the value of the homestead,
so there was no equity in the property. The bankruptcy court overruled the trustee's objection, holding that even
though the debtors used $100,000.00 of non-exempt cash to help purchase the homestead, the trustee could obtain

and the Debtor reach an agreement, or the Trustee sells his equitable lien to a third party, there

could well be a forced sale of the Debtor's homestead for the benefit of the estate.

      Despite the sacrosanct status accorded to homesteads in Texas, a forced sale scenario on

Unit 320—made possible by the imposition on an equitable lien—is in accordance with Texas

law.  Granted, it is true that "[t]he homestead of a family or of a single adult person is exempt

from forced sale for the payment of all debts except for those classes of indebtedness enumerated

in Article 16, Section 50(a) of the Texas Constitution."  *In re Estate of Byrom*, No. 12–12–

00374–CV, 2013 WL 3967432 (Tex. App.—Tyler July 31, 2013, pet. denied); *see also In re

Swift*, 124 B.R. 475, 486 (Bankr. W.D. Tex. 1991) ("Generally, property occupied as a

homestead cannot be subjected to the satisfaction of debts or of claims against the homestead

owner.") (citing Tex. Const. art. XVI, §§ 50–52; TEX. PROP. CODE § 41.002(a); *Kunkel v.

Kunkel*, 515 S.W.2d 941 (Tex. Civ. App.—Amarillo 1974, writ ref'd n.r.e.); *Englander Co. v.

Kennedy*, 424 S.W.2d 305 (Tex. Civ. App.—Dallas 1968, writ ref'd n.r.e.)).  However, "[i]t has

long been decided that [the] homestead and exemption laws of this State were never intended to

be, and cannot be, the haven of wrongfully obtained money or properties." *Baucom v. Texam Oil*

---

no relief under § 522(o) because there was "no realizable equity in the home." *Id.* at 91.  The trustee contended that even if there was no equity at the time, he was nevertheless entitled to an equitable lien on the homestead—thereby preserving a possibility that he could eventually be able to recover the $100,000.00 for the estate if the homestead's value increased in the future, or if the debtors continued to pay down the lien.

The BAP affirmed the bankruptcy court's ruling "because we, like the bankruptcy court, interpret the phrase "value of an interest in . . . real [ ] property" in § 522(o) as "the measure of the increase in monetary value of the economic interest in real property claimed as a homestead due to a fraudulent transfer of non-exempt funds into the property, rather than a title interpretation of the word 'interest.'" *Id.* at 90 (emphasis added).  The BAP therefore rejected the notion that the trustee was entitled to an equitable lien, holding that "the statue was enacted to prevent the fraudulent attempt to build up equity in a homestead." *Id.* at 94.

There is no question that *Willcut* stands for the proposition that if the debtor has no equity in the homestead, then the trustee is not entitled to any equitable lien on the homestead.  A logical extension of this holding is that if there is equity in the homestead—such as in the case at bar—then the trustee is entitled to an equitable lien.  To the extent that *Willcut* can be interpreted in this manner, this Court wholeheartedly agrees with this view.  To the extent that *Willcut* is interpreted to mean that under no circumstances can a trustee be granted an equitable lien, this Court disagrees, and concludes that if there is equity, the trustee is entitled to such a lien.

*Corp.*, 423 S.W.2d 434, 442 (Tex. Civ. App.—El Paso 1967, writ ref'd n.r.e.).  "[T]he homestead protection afforded by the Texas Constitution was never intended to protect stolen funds." *Bransom v. Standard Hardware*, 874 S.W.2d 919, 928 (Tex. App.—Fort Worth 1994, writ denied).  In the case at bar, this Court concludes that the Debtor's actions are sufficiently egregious to fall within the exception to the general rule that Texas homesteads are protected from forced foreclosures.

A discussion of Texas case law underscores why this exception applies to the Debtor.  In *Gamble-Ledbetter v. Andra Group, LP (In re Gamble-Ledbetter)*, 419 B.R. 682 (Bankr. E.D. Tex. 2009), a judgment creditor objected to the debtor's claimed homestead exemption, and the debtor sought to avoid the judgment creditor's equitable lien pursuant to § 522(f)(1).  *Id.* at 699–01.  The debtor had used fraudulently obtained funds to pay a portion of the purchase price of the claimed homestead.  *Id.* at 700.  The bankruptcy court held that the judgment creditor's equitable lien was not avoidable and that the debtor's exemption claim was subordinated and subject to the equitable lien because "[u]nder Texas law, the [judgment creditor] hold[s] equitable title to the Home up to the amount of the fraudulently obtained funds," as "property purchased with wrongfully obtained funds never becomes the property of the wrongdoer."  *Id.* at 701–02 (citing *First State Bank of Ellinger v. Zelesky*, 262 S.W. 190, 192 (Tex. Civ. App.—Galveston 1924, no writ)).  The court stated:

> [I]t is certainly true that imposition of the equitable lien under these circumstances simply recognizes the superior equitable title which vested in [the judgment creditor] under Texas law when its money was fraudulently used by the Debtor to pay for a portion of her home mortgage and it does not constitute an improper impairment of any exemption right of the Debtor.

*Id.* at 700.

In *In re Huie*, No. 07–40627, 2007 WL 2317152 (Bankr. E.D. Tex. 2007), the state court granted Monty and Bonnie Hobbs (the Hobbs) a judgment lien on the debtors' homestead because it found that "the Debtors wrongfully obtained funds from the Hobbs by committing fraud in a real estate transaction and that the Debtors reinvested the fraudulently obtained funds in their Home." *Id.* at *1, *2. The bankruptcy court denied the debtors' motion to invalidate lien upon exempt property and sustained the Hobbs' objection to the debtors' homestead exemption because "Texas law does not permit the Debtors to use their homestead exemption to shield the Home from the Hobbs' superior equitable interest in the Home." *Id.* at *5, * 7 (citing *Smith v. Green*, 243 S.W. 1006, 1007–08 (Tex. Civ. App.—Amarillo 1922, writ ref'd); *Owen v. Owen*, 500 U.S. 305, 308–09 (1991)).

In *Bransom*, the appellant's wife fraudulently converted funds and used the stolen funds to pay for their homestead. *Bransom v. Standard Hardware*, 874 S.W.2d 919, 923, 928(Tex. App.—Fort Worth 1994, writ denied). The court affirmed the imposition of a constructive trust on the proceeds of the sale of the appellant's homestead because "[s]tolen funds used for the purchase of a homestead . . . can never acquire homestead rights as they are held in trust for the rightful owners of the funds." *Id.* at 928 (citation omitted).

In *In re Estate of Byrom*, the court affirmed the county court's imposition of a constructive trust and order of a sale of the appellant's homestead property. *In re Estate of Byrom*, 2013 WL 3967432, at *1. The appellant, while he was executor of his mother's estate, used money from his mother's estate to construct his claimed homestead. *Id.* at *2. The court held that because the appellant wrongfully used the estate's money to construct the claimed homestead—leaving the probate estate with no money to pay the claims against it—the

"homestead law does not protect property or funds obtained with money misappropriated by a fiduciary." *Id.*

In the case at bar, imposition of an equitable lien to allow for a forced foreclosure sale on Unit 320 is in accord with the holdings in *Gamble-Ledbetter*, *Huie*, *Bransom*, and *Byrom*. Indeed, just like Mr. Byrom, who had a fiduciary duty to the creditors of the probate estate for which he was the executor, the Debtor had, in his capacity as a debtor-in-possession, a fiduciary duty to his creditors in the Second Chapter 11 Case when he transferred the 2010 Note to MELP in order to acquire the warranty deed to Unit 320. *See, e.g.*, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, LLC)*, 650 F.3d 593, 601 (5th Cir. 2011) (stating that a debtor-in-possession has a fiduciary duty to his creditors and equity holders); *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513 (7th Cir. 1991) ("Schipper was a debtor in possession and, as such, owed a fiduciary duty to his unsecured creditors."). And, just like all of the individuals in *Gamble-Ledbetter*, *Huie*, *Bransom*, and *Byrom* claiming homestead exemptions, the Debtor wrongfully used an asset (the 2010 Note) not belonging to him (but rather to the bankruptcy estate) to acquire the warranty deed to Unit 320. Thus, this Court, just like the bankruptcy courts in *Gamble-Ledbetter* and *Huie*, believes that an equitable lien is appropriate in order to accomplish the purpose of § 522(o). If the Trustee is forced to hold a foreclosure sale on Unit 320, so be it.

## B.   Adequate Protection that the Debtor Must Provide to the Trustee

There is no question that the Debtor continues to occupy and reside at Unit 320. And, as the calculations above reflect, after the liens of MELP, the HOA, and the IRS are paid, the remaining equity in Unit 320 of $140,975.91 belongs entirely to the estate; the Debtor himself has no equity. The Debtor is therefore using property of the estate, and thus must provide

adequate protection to the Trustee under §§ 361 and 362(d).  *See* 11 U.S.C. §§ 361, 362(d); *In re Good*, 428 B.R. 235, 242 (Bankr. E.D. Tex. 2010) ("While the automatic stay preserves the status quo for debtors, adequate protection preserves the status quo for secured creditors.").

"The Code does not exclusively define the term 'adequate protection.'"  *In re Good*, 428 B.R. at 242.  In the case at bar, the Trustee's interest in Unit 320 must be protected against foreclosure by MELP under the Deed of Trust and imposition of any tax lien for failure to pay taxes.  Moreover, the Trustee's interest in Unit 320 must be protected insofar as insurance must be kept in place in the event Unit 320 is damaged.  Finally, Unit 320 must be maintained to preserve its value.  Accordingly, this Court finds that the form of adequate protection that needs to be provided is for the Debtor to make current payments to MELP as required under the $52,880 Note, to make timely monthly payments as necessary to pay property taxes, insurance, and HOA fees, and to pay other ongoing expenses—such as plumbing and electrical repairs—necessary to preserve the value of the estate's interest in Unit 320.  *See* 11 U.S.C. § 361(3) ("Adequate protection may be provided by granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.").  The Debtor must provide this adequate protection until the earlier of: (1) the Trustee's sale of Unit 320; or (2) the Debtor vacates Unit 320.

## VI. CONCLUSION

The bankruptcy process is only fair when debtors are willing to present themselves and their financial status fully and openly to the court, the creditors, and the trustee.  *In re Henley*, 480 B.R. 708, 806 (Bankr. S.D. Tex. 2012).  Here, the Debtor did not present himself and his financial status fully and openly; rather, he hid the ball with respect to his transfer of the 2010 Note in conjunction with his acquisition of Unit 320.  He therefore violated the most

fundamental canon of bankruptcy: total transparency.  *See Sanchez v. Ameriquest Mort. Co. (In re Sanchez)*, 372 B.R. 289, 305 (Bankr. S.D. Tex. 2007) ("The three most important words in the bankruptcy system: disclose, disclose, disclose.").

Sir Walter Scott, the Scottish author and novelist, aptly made the following observation: "Oh what a tangled web we do weave, when we practise to deceive!"[61]  That is what the Debtor has done in this bankruptcy court.  The Trustee, acting like the spider, has caught the Debtor in a web of deception; and the Debtor, in an effort to "spin" his acquisition of Unit 320 as completely above board, has become entangled beyond saving.

Because the Trustee has proven all four elements of §522 (o), and because the Debtor has failed to establish any defenses, the Court sustains the Objection.

An Order consistent with this Memorandum Opinion will be issued simultaneously on the docket with the entry of this Opinion.


Signed:   March 21, 2014

_____
Jeff Bohm
Chief United States Bankruptcy Judge

---

[61] Sir Walter Scott, *Marmion*, *Canto vi. Stanza 17*.  The Court notes that the word "practise" is not misspelled in this quotation.